JOEL C. SPANN  #9660
jcs@severson.com
ANDREW S. ELLIOTT (CA Bar No. 254757) (pro hac vice application pending)
ase@severson.com
SAMUEL R. MELAMED (CA Bar No. 301303) (pro hac vice application pending)
srm@severson.com
SEVERSON & WERSON
A Professional Corporation
595 Market Street, Suite 2600
San Francisco, California 94105
Telephone: (415) 398-3344
Facsimile: (415) 956-0439

Attorneys for Plaintiffs Ally Bank and
Ally Financial Inc.

## UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAI'I

| | |
|---|---|
| ALLY BANK, a Utah state chartered bank; ALLY FINANCIAL INC., a Delaware corporation,<br><br>        Plaintiffs,<br><br>    vs.<br><br>BAYVIEW AUTO SALES, INC., a Hawaii corporation; EDWARD J. SHAUGHNESSY, an individual,<br><br>        Defendants. | Civil Action No. 1:23-cv-456<br><br>**COMPLAINT FOR BREACH OF CONTRACT, SPECIFIC PERFORMANCE, AND RESCISSION** |

## **COMPLAINT**

Plaintiffs Ally Bank and Ally Financial Inc. (collectively referred to as "Plaintiffs" or "Ally") file this Complaint against defendants Bayview Auto Sales, Inc., formerly known as Bayview Auto Sales, LLC ("Bayview") and Edward J. Shaughnessy ("Shaughnessy") (collectively, "Defendants").

### A.    NATURE OF THE ACTION

1.    Ally brings this action to, among other things, enforce its rights as

lender under its financing agreements with defendant Bayview, an automobile dealership, and the obligations of the guarantor of those financing and loan agreements, defendant Shaughnessy.

2.     Bayview is in default of its obligations, having breached its financing agreements with Ally by assigning to Ally certain retail installment sale contracts ("Sales Contracts") that were obtained via false employment and income information, and then refusing to repurchase and accept reassignment of these Sales Contracts upon demand.

3.     Accordingly, Ally brings this action seeking judgment for the outstanding indebtedness owed by Defendants and any other relief to which Ally may be entitled.

## B.     PARTIES

4.     Plaintiff Ally Bank, a/k/a Ally Capital in Hawaii, is a Utah state chartered bank, with its principal place of business located at 200 West Civic Center Drive, Suite 201, Sandy, Utah 84070.  For jurisdictional purposes, Ally Bank is a citizen of Utah.

5.     Plaintiff Ally Financial Inc. ("Ally Financial") is a corporation formed under the laws of the state of Delaware with a principal place of business at 500 Woodward Avenue, Detroit, Michigan 48226.  For jurisdictional purposes, Ally Financial is a citizen of Delaware and Michigan.

6.     Defendant Bayview is a domestic profit corporation formed under the laws of Hawaii, with its principal place of business located at 94-267 Farrington Highway, Waipahu, Hawaii 96797.  For jurisdictional purposes, Bayview is a citizen of Hawaii.

7.     Ally is informed and believes, and thereon alleges that defendant Shaughnessy is a citizen of the United States and a domiciliary of Hawaii with a

permanent residence in Mililani, Hawaii.  For jurisdictional purposes, Shaughnessy is a citizen of Hawaii.

### C.    JURISDICTION AND VENUE

8.    The jurisdiction of the Court over the subject matter of this action is predicated on diversity jurisdiction as defined by 28 U.S.C. § 1332.  The amount in controversy, exclusive of interest and costs, exceeds $75,000.00, and the claims are between citizens of different states.

9.    This Court has general and specific jurisdiction over all defendants because they are all citizens of Hawaii, have continuous and systematic contacts with Hawaii, are entities formed under the laws of Hawaii, and/or have purposefully availed themselves of the privilege of conducting business in Hawaii, and the events, transactions, and omissions giving rise to the claims in this action occurred in Hawaii.

10.    Venue is proper under 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to the claims occurred in Honolulu County, which is within this judicial district.

### D.    GENERAL ALLEGATIONS
### The Master Retail Agreement

11.    Bayview is a retail automobile dealership in the business of selling motor vehicles to the public.  Shaughnessy is the CEO of Bayview.  Ally, from time to time, provides retail financing accommodations to Bayview by accepting assignment of some of the Sales Contracts entered into between retail customers and Bayview.

12.    These transactions are governed by an agreement between Bayview and Ally titled Ally Master Retail-Lease Agreement, dated as of August 9, 2016 (the "Master Retail Agreement").  The Master Retail Agreement incorporates by

reference the Ally Retail Plan ("Retail Plan"), which is attached to the Master Retail Agreement as Exhibit 1. A true and correct copy of the Master Retail Agreement is incorporated by reference and attached as **Exhibit A**.

13.      When a customer of Bayview finances all or a portion of a vehicle purchase, Bayview sells the vehicle to the customer pursuant to a Sales Contract. In exchange, the customer grants a security interest in the vehicle to the holder of the Sales Contract. Bayview then markets and assigns, *i.e.*, sells, the Sales Contract to lenders such as Ally.

14.      Ally, in its discretion, may accept assignment of Sales Contracts from Bayview by paying Bayview the balance due under the Sales Contract plus a portion of the present value of the interest due (dealer finance income). Thereafter, the buyer is obligated to make his or her monthly installment payments to Ally, and Bayview is, among other things, obligated to register and title the vehicle so as to perfect Ally's security interest therein.

15.      By assigning the Sales Contracts to Ally in exchange for value, Bayview is able to realize the proceeds from the sale of a vehicle immediately, rather than via partial installment payments. Ally, in turn, takes assignment of the Sales Contracts, services the account, and collects the monthly installment payments, including interest. In taking assignment of these Sales Contracts, Ally relies upon the representations and warranties made by Bayview as to, among other things, the buyer's creditworthiness.

16.      Here, Bayview breached the Master Retail Agreement by assigning to Ally at least thirty-one (31) Sales Contracts which were obtained via false income and employment information. The 31 subject Sales Contracts, which correspond to vehicle sales between January and October 2022, are listed on the attached **Exhibit B** (the "Exhibit B Sales Contracts"), which is incorporated by reference herein.

17.      Specifically, the buyers who purchased these vehicles misrepresented

their income and employment in their financing applications by, among other things, submitting counterfeit paystubs for each buyer (the misrepresentations and false documentation are collectively referred to as the "False Information").  This constitutes a default under the terms of each buyer's Sales Contract, which provides in pertinent part:

> You will be in default if … (d) any representation that you have made to us in this contract or to induce us to make this contract is false, or (e) you give false, incomplete, or misleading information during credit application.

18. Each buyer's financing application provides in pertinent part:

> You certify that the information on the application and in any other application submitted to us, is true and complete.

19. Anonymized exemplars of the subject Sales Contracts and financing applications are attached as **Exhibits C** and **D.**

20. Section 6 of the Retail Plan, entitled "Dealer Warranties and Representations" provides in relevant part:

> With respect to each Contract submitted to Ally, Dealer warrants and represents:
>
> (a)    The Contract conforms to the application approval communicated by Ally, the Application Information submitted to Ally, and to any applicable Ally Bulletins;
>
> […]
>
> (e)    The advertisement, solicitation, and sale of the vehicle described on the face of the Contract and any related aftermarket product complied with applicable Law;
>
> […]

(g)     To the best of Dealer's knowledge, all Application Information submitted is accurate;

[…]

(l)     No party to the Contract or a related document was in default at the time of assignment;

[…]

(m)    The Contract's negotiation and execution complied with applicable Law; ….

21.     Bayview breached its obligations to Ally under the Master Retail Agreement, including but not limited to the above-referenced representations and warranties.

22.     For example, at the time each of the Exhibit B Sales Contracts were assigned to Ally, the buyers were in default under the related Sales Contracts because they provided False Information to Dealer in connection with the application and execution of the Sales Contracts.  Ally relied on the False Information in connection with its decision to purchase the Exhibit B Sales Contracts and further relied on Dealer to properly diligence and review the accuracy of such information.  Ally's investigation into the False Information submitted in connection with the Exhibit B Sales Contracts is ongoing.

23.     Due to the submission of the False Information, the retail customers were in default under the Exhibit B Sales Contracts when Dealer assigned those contracts to Ally.  Consequently, Bayview breached its obligations to Ally under the Master Retail Agreement, including but not limited to Section 6(l) of the Retail Plan.

24.     Section 7 of the Retail Plan, entitled "Repurchase," provides in relevant part:

> If any warranty or representation above or any term in the Agreement is breached, Dealer shall, upon demand, accept assignment of any Contract related to such breach and pay to Ally the full amount of the unpaid balance under the Contract, the unearned portion of any DFI [Dealer Finance Income] paid in connection with the Contract, and reimbursement for any repossession expenses incurred. Ally has no duty to repossess or transfer a vehicle to Dealer as a condition of a Contract repurchase.

25. On July 24, 2023, and continuing thereafter to the present, Ally requested that Bayview accept reassignment of the Exhibit B Sales Contracts and pay the unpaid balances due thereunder, but Bayview has refused to do so. This failure to accept reassignment of the Exhibit B Sales Contracts from Ally and pay the full amount of the unpaid balances due thereunder to Ally constitutes a breach of Bayview's obligations to Ally under the Master Retail Agreement. As of November 2, 2023, $413,350.42 is owed under the Exhibit B Sales Contracts.

26. Bayview has also breached its obligations under the Master Retail Agreement by failing to pay amounts owed under its Dealer Finance Income ("DFI") account. Section 2 of the Retail Plan, entitled "Dealer Finance Income; DFI Account" provides:

> Ally shall credit Dealer's DFI Account for any DFI earned on eligible Contracts. Unless otherwise provided, DFI shall be calculated based on the finance charges attributable to any difference between Ally's buy rate and the Contract rate or a percentage thereof, subject to any caps, limitations, or other conditions set by Ally. Ally may debit Dealer's DFI Account for any amounts owed by Dealer to Ally, including (but not limited to) amounts owed by Dealer because of Contract prepayments. Unless otherwise agreed, Ally shall settle Dealer's DFI Account monthly (subject to reasonable adjustments) by depositing any positive balance in Dealer's ACH

Account and withdrawing any negative balance from Dealer's ACH Account.  If, at any time, Dealer's DFI Account has a negative balance, Dealer shall pay such balance immediately upon demand.

27.     Under the Master Retail Agreement, Bayview is obligated to reimburse Ally for the unearned portion of finance income related to prepayment, repossession, or reassignment of any outstanding Sales Contracts.  To facilitate these reimbursements and other debits or credits under the Master Retail Agreement, Bayview authorized Ally to withdraw and deposit funds from or into an account held by Bayview via automated clearing house transactions ("ACH account").  See Exhibit A, Exhibit 7.

28.     As of October 31, 2023, Bayview owes Ally $700.69 in unpaid DFI charges.

### Shaughnessy's Personal Guaranty

29.     On August 9, 2016, in order to induce Ally to enter into the Master Retail Agreement with Bayview, Shaughnessy made, executed, and delivered to Ally a written personal continuing guaranty, entitled "Guaranty and Acknowledgment Agreement for Retail Chargebacks" ("Guaranty").  Under the Guaranty, Shaughnessy guaranteed full payment and performance of all obligations of Bayview to Ally under the Master Retail Agreement, including but not limited to all existing and future indebtedness of Bayview to Ally, together with all costs of collecting such indebtedness, including reasonable attorneys' fees incurred by Ally.  A true and correct copy of the Guaranty is attached as **Exhibit C**, and is incorporated by this reference.

30.     Under the Guaranty, Shaughnessy, among other things, waived any right to require Ally to proceed against any other person or to require that Ally proceed against or exhaust any security.

### E.    CLAIM FOR RELIEF NO. 1

### Breach of Master Retail Agreement

### (Ally Against Bayview)

31.    Ally hereby incorporates by reference all prior allegations of this complaint as though fully set forth herein.

32.    Ally has performed all conditions, covenants and promises required of it in accordance with the terms and conditions of the Master Retail Agreement.

33.    As detailed above, Bayview breached its obligations to Ally under the Master Retail Agreement, including but not limited to Section 2, Section 6, and Section 7 of the Retail Plan

34.    As of November 2, 2023, the unpaid balances under the Exhibit B Sales Contracts, and the amounts owed to Ally, total $413,350.42.  The amounts owed under each Exhibit B Sales Contract are contained in Exhibit B.

35.    As of October 31, 2023, the total amount of unpaid DFI charges owed to Ally is $700.69.

36.    As of November 2, 2023, Bayview's total indebtedness to Ally under the Master Retail Agreement, and the amount by which Ally has been damaged as a result of Bayview's breaches of the Master Retail Agreement, is $414,051.11. Interest and other expenses continue to accrue as determined by the terms and provisions of the Master Retail Agreement, Exhibit B Sales Contracts, and all applicable law.

### F.    CLAIM FOR RELIEF NO. 2

### Breach of Personal Guaranty

### (Ally Against Shaughnessy)

37.    Ally hereby incorporates by reference all prior allegations of this complaint as though fully set forth herein.

38.    Under the Guaranty, Shaughnessy guaranteed full payment and

performance of all obligations owed to Ally by Bayview under the Master Retail Agreement (including Exhibit 1, the Retail Plan), including but not limited to all existing and future indebtedness of Bayview to Ally, together with all costs of collecting such indebtedness, including reasonable attorneys' fees, incurred by Ally.

39.     Bayview breached the Master Retail Agreement, as alleged above. Bayview's indebtedness to Ally under the Master Retail Agreement in the amount of $414,051.11, together with interest and other expenses which continue to accrue in accordance with the terms and provisions of the Master Retail Agreement, Exhibit B Sales Contracts, and applicable law, is now due and payable in full.

40.     Bayview's indebtedness to Ally under the Master Retail Agreement is an obligation of Shaughnessy which is included within the Guaranty.

41.     As of November 2, 2023, by reason of his Guaranty of the indebtedness owed by Bayview to Ally under the Master Retail Agreement, Shaughnessy owes Ally Bank approximately $414,051.11, together with interest and other expenses which continue to accrue.

## G.     CLAIM FOR RELIEF NO. 3
### Specific Performance
### (Ally Against Bayview)

42.     Ally hereby incorporates by reference all prior allegations of this complaint as though fully set forth herein.

43.     Under Section 7 of the Retail Plan, Bayview agreed that if it breached any of the representations, warranties, or terms under the Master Retail Agreement, it would accept reassignment of any Sales Contract related to such breach and pay Ally the full amount of the unpaid balance due under said Sales Contract, as well as the unearned portion of the Dealer Finance Income and reimbursement for any repossession expenses.

44.     Dealer breached Section 6 of the Retail Plan by assigning the Exhibit B Sales Contracts to Ally when the buyers were in default thereof.

45.     Due to the defaults of the Master Retail Agreement specified above, Ally has requested that Bayview repurchase and accept reassignment of each of the Exhibit B Sales Contracts.  To date, Bayview has failed, neglected, and refused to repurchase and accept reassignment of the Exhibit B Sales Contracts.

46.     Accordingly, Ally seeks specific performance of those portions of the Master Retail Agreement that require Bayview to accept reassignment of and repurchase the Exhibit B Sales Contracts.

## H.     CLAIM FOR RELIEF NO. 4
### Rescission of Exhibit B Sales Contracts Based on Lack of Mutual Assent
### (Ally Against Bayview and Shaughnessy)

47.     Ally hereby incorporates by reference all prior allegations of this complaint as though fully set forth herein.

48.     The formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.

49.     The Exhibit B Sales Contracts and related credit application contain False Information.  Ally was not aware of the False Information at the time it purchased the Exhibit B Sales Contracts from Dealer.  Consequently, there was no manifestation of mutual assent in each of these transactions because Ally did not assent to purchase Sales Contracts containing False Information.

50.     Ally is entitled to rescission of the assignment of each of the Exhibit B Sales Contracts.  For avoidance of doubt, Ally does not request rescission of the Master Retail Agreement or Retail Plan attached as Exhibit A.  Ally's rescission request is limited exclusively to Dealer's assignment of the Exhibit B Sales Contracts to Ally.

## CLAIM FOR RELIEF NO. 5

### Attorneys' Fees

### (Ally Against Bayview and Shaughnessy)

51.     Ally hereby incorporates by reference all prior allegations of this complaint as though fully set forth herein.

52.     Ally is entitled to recover its attorneys' fees and costs from Bayview, pursuant to the Master Retail Agreement.  By the terms of the Master Retail Agreement, Bayview agreed to indemnify Ally for any "Loss" as defined therein, in connection with Bayview's breach of the Master Retail Agreement, including Ally's reasonable attorneys' fees.  Ally has retained the undersigned counsel to commence and prosecute this action, and Ally is entitled to recover its attorneys' fees and costs incurred.

53.     Ally is entitled to recover its attorneys' fees and costs from Shaughnessy, pursuant to the Guaranty.  By the terms of the Guaranty, Shaughnessy agreed to pay Ally for its attorneys' fees and expenses incurred in connection with any default of Bayview.  By reason of Bayview's defaults described herein, Ally has retained the undersigned counsel to commence and prosecute this action, and Ally is entitled to recover its attorneys' fees and costs incurred.

### PRAYER

WHEREFORE, Ally prays for judgment as follows:

As to the First Claim for Relief, for damages under the Master Retail Agreement in the sum of $414,051.11, as of November 2, 2023, with interest and charges as allowed under the Master Retail Agreement;

As to the Second Claim for Relief, for damages against Shaughnessy under the Guaranty in the sum of $414,051.11, as of November 2, 2023, with interest and charges as allowed under the Guaranty;

As to the Third Claim for Relief, for an ORDER requiring Bayview to accept reassignment of and repurchase the Exhibit B Sales Contracts from Ally;

As to the Fourth Claim for Relief, for an order rescinding the assignment of the Exhibit B Sales Contracts.

As to the Fifth Claim for Relief, for reasonable attorneys' fees and costs of suit incurred herein; and,

For such other and further relief as the Court may deem just and proper.

DATED:  November 6, 2023          SEVERSON & WERSON
                                  A Professional Corporation


                                  By:  _____
                                            JOEL C. SPANN

                                  Attorneys for Plaintiffs Ally Bank and Ally
                                  Financial Inc.

# EXHIBIT A

## ALLY MASTER RETAIL-LEASE AGREEMENT

This Ally Master Retail-Lease Agreement ("Master Agreement") is made between Ally Financial Inc. ("Ally Financial"), Ally Bank (a/k/a Ally Capital in Hawaii, a/k/a Ally Bank Corp. in New Mexico, n/k/a Ally Capital Corp. in Arizona, Mississippi, New Jersey, Montana, and Wisconsin) ("Ally Bank") and the dealer identified in the signature block below ("Dealer").

WHEREAS, Ally Financial and Ally Bank provide retail and lease accommodations to motor vehicle dealerships, and others, by taking assignment of motor vehicle retail installment sale and lease contracts that they, respectively, enter into with their customers ("Retail and Lease Accommodations").

WHEREAS, Dealer enters into motor vehicle retail installment sale and lease contracts with its customers and wants Ally Financial and Ally Bank to provide Dealer with Retail and Lease Accommodations,

WHEREAS, Ally Financial and Ally Bank are willing to provide Retail and Lease Accommodations to Dealer, but only under the terms hereof,

NOW THEREFORE, for good and valuable consideration, Ally Financial, Ally Bank, and Dealer agree as follows:

Section 1. Definitions. The following definitions apply to the Master Agreement and the Retail and Lease Documents:

*Ally* means either Ally Financial or Ally Bank, depending on the context. For applications submitted by Dealer for consideration, it means Ally Financial if Ally Financial evaluated the application and Ally Bank if Ally Bank evaluated the application. For Contracts or Leases submitted by Dealer for purchase, it means Ally Financial if Ally Financial has indicated that it will purchase a Contract or Lease and Ally Bank if Ally Bank has indicated that it will purchase a Contract or Lease. *Ally* also means Ally Financial in connection with any Ally Financial customer relationship, data, or asset and Ally Bank in connection with any Ally Bank customer relationship, data, or asset. For contractual commitments made by Dealer to *Ally* that do not involve a particular application, Contract, or Lease, Dealer makes such commitment separately and independently to both Ally Financial and Ally Bank. For contractual commitments made by *Ally* to Dealer that do not involve a particular application, Contract, or Lease, or that apply to all applications, Contracts and/or Leases generally, Ally Financial (and solely Ally Financial) makes such commitment to Dealer unless otherwise specified.

*Ally Bulletin* means any bulletin, letter, guide, manual, rate sheet, dealer website, or other communication, whether in written or electronic form, containing terms, conditions, rules, or requirements for dealers submitting applications to Ally or its affiliates for consideration or Contracts or Leases for purchase by Ally or its affiliates.

*Agreement* means this Master Agreement and the Retail and Lease Documents.

*Consumer Information* means consumer information as defined in regulations of the Federal Trade Commission, the Federal Deposit Insurance Corporation, the Bureau of Consumer Financial Protection, or any other regulator with jurisdiction over Ally Financial or Ally Bank that govern the privacy, confidentiality, security and disposal of consumer information, that is furnished to Dealer by Ally, including information furnished by Ally affiliates or service providers on behalf of Ally, or that Dealer obtained through its provision of services to Ally, regardless of whether such information is in paper, electronic, digital, or other form.

*Dealer Finance Income* ("DFI") means any amount payable to Dealer because a Contract rate or Lease rate exceeds the applicable Ally buy rate; any minimum payment to Dealer for assigning a Contract or Lease to Ally, and any other amount that Ally designates as DFI. The amount of DFI to be paid shall be determined as set forth in this Agreement, any applicable Ally Bulletin, and/or any separate written agreement between the parties, and is subject to any caps, limitations, or other conditions set by Ally.

*DFI Account* means the account to which Ally credits DFI owed to Dealer prior to payment.

*Law* means, as may be amended and in effect from time to time, (i) any federal, state or local law (including common law), statute, regulation, or ordinance, (ii) any written guidance or substantive recommendation issued by a regulator with jurisdiction over a party, and (iii) any injunction, order, judgment, directive or determination of any governmental authority or court, or any order or judgment of any arbitrator. Unless the context requires otherwise, a reference to applicable Law means each and every Law applicable in that context.

*Loss* means any loss, liability, damage (whether direct or indirect), cost or expense of any nature, including but not limited to, reasonable attorneys' fees.

*Retail and Lease Documents* means, individually and collectively, the documents listed in Section 2 of this Master Agreement or otherwise made an exhibit to this Master Agreement.

GAGCGG_AMSTRLTWLVC (09/15)

Any term defined in this Master Agreement or a Retail and Lease Document shall have the same meaning in other Retail and Lease Documents (or the Master Agreement, if applicable) unless otherwise defined.

**Section 2.** Agreement to Incorporate Retail and Lease Documents by Reference. Each of the following Retail and Lease Documents is incorporated by reference into this Master Agreement as though fully set forth in it:

| | Title |
|----|-------|
| 1. | Ally Retail Plan |
| 2. | Submission of Applications to Ally |
| 3. | Joint Marketing Agreement |
| 4. | Ally Lease Plan |
| 5. | Terms of Sale for Ally Vehicles |
| 6. | Dealer Authorization to Ally to Withdraw and Deposit Funds Via Commercial Bank Automated Clearing House Transactions |

Dealer's signature on this Master Agreement indicates its agreement to each of the Retail and Lease Documents. By signing this Master Agreement, Dealer agrees to and accepts all provisions, terms, and conditions contained in each of the Retail and Lease Documents. Dealer waives any right to disavow or challenge the validity or enforceability of any Retail and Lease Document (in whole or in part) on the basis that such Retail and Lease Document does not contain the Dealer's signature, was not signed by an authorized signatory, or on any similar basis.

**Section 3.** No Commitment to Provide Retail and Lease Accommodations. Nothing in the Agreement constitutes a commitment by Ally Financial or Ally Bank to provide Retail and Lease Accommodations or any other loans or credit accommodations to Dealer. Ally Financial and Ally Bank provide Retail and Lease Accommodations at their sole discretion. Ally Retail and Lease Accommodations are expressly subject to the terms and conditions under which they are extended.

**Section 4.** Dealer Finance Income for Contracts. In connection with Ally's purchase of Contracts, for Contracts eligible for rate-based DFI, Ally shall pay a designated percentage (currently 75%) of such DFI to Dealer in the month the Contract is purchased by crediting the Dealer's DFI Account. The unearned portion of DFI is subject to chargeback if the Contract is cancelled, terminated, or prepaid in full for any reason within ninety (90) days from the date of consummation. Upon prior written notice, Ally may, at its sole discretion, increase or decrease the designated percentage of rate-based DFI paid upfront on Contracts purchased after such notice.

**Section 5.** Dealer Finance Income for Leases. In connection with Ally's purchase of Leases, for Leases eligible for rate-based DEI, Ally shall pay one hundred

percent (100%) of the rate-based DEI to be earned during the Lease term on a rebatable basis. Dealer shall repay any unearned DFI on a prepaid Lease, except that Dealer shall not owe unearned DFI on a Lease that terminates within six (6) months of its scheduled end date.

**Section 6.** Independence of Ally and Dealer. No agency, partnership, joint venture, employer-employee or franchisor-franchisee relationship is intended or created by this Agreement. Dealer is an independent business and not acting on Ally Financial's behalf or Ally Bank's behalf. No party owes any other party any fiduciary obligation.

**Section 7.** Separate Accommodations with Ally Financial and Ally Bank. Dealer recognizes that Ally Financial and Ally Bank are providing separate Retail and Lease Accommodations to Dealer with the terms consolidated in a single document for the convenience of the parties. Ally Bank is not responsible for the performance or conduct of Ally Financial, and Ally Financial is not responsible for the performance or conduct of Ally Bank. Dealer shall not assert against Ally Bank any claim, defense, or set-off relating to Ally Financial, and Dealer shall not assert against Ally Financial any claim, defense, or set-off relating to Ally Bank. This Agreement does not create any rights or obligations between Ally Financial and Ally Bank.

**Section 8.** Perfection of Security Interests. For purposes of Dealer's Retail and Lease Accommodations with Ally, Dealer authorizes Ally to mark chattel paper, note liens on documents of title, and take any and all other actions necessary to perfect any Ally security interest in Contracts, Leases, or related vehicles.

**Section 9.** Assignment. Dealer may not assign this Agreement (or any portion thereof, including any of the Retail and Lease Documents) without Ally Financial's and Ally Bank's prior written consent, such consent not to be unreasonably withheld. Upon notice to Dealer, Ally Financial or Ally Bank may assign this Agreement (or any portion thereof, including any of the Retail and Lease Documents) without Dealer's consent to any affiliate or subsidiary or pursuant to a merger, reorganization, sale of all or substantially all of the assets of Ally Financial or Ally Bank or sale of sufficient stock to constitute a change of control. This Agreement will be binding on the parties and their respective successors and permitted assigns. In the event of an assignment of all or part of this Agreement to an affiliate or subsidiary of Ally Financial or Ally Bank pursuant to this Section, (i) the performance and obligations that have been assigned to the affiliate or subsidiary are the exclusive responsibility of the entity to whom the performance and obligations were assigned

GAGCGG_AMSTRLTWLVC (09/15)

and (ii) the affiliate or subsidiary has all of the rights and benefits of the assigning party (Ally Financial or Ally Bank as the case may be) under this Agreement. Any assignment in violation of this Section will be void. Any right accruing to Ally Bank or Ally Financial prior to the assignment shall remain with such party, unless otherwise required by law or the specific terms of the assignment specify otherwise.

**Section 10.** Compliance with Applicable Law. Dealer shall comply with applicable Law in connection with any and all transactions or communications related to, or arising from, any application submitted to Ally for consideration or any Contract or Lease submitted for purchase by Ally.

**Section 11.** Compliance with Ally Bulletins. In connection with any application submitted for Ally's consideration and any Contract or Lease submitted for Ally's purchase, Dealer shall comply with all applicable Ally Bulletins.

**Section 12.** General Indemnification. Dealer shall indemnify Ally for any Loss that Ally incurs due to Dealer's (i) breach of the Agreement, (ii) willful misconduct, or (iii) gross negligence.

**Section 13.** Termination. Ally Financial may terminate this Agreement as it relates to Ally Financial and Dealer, or the terms of any individual Retail and Lease Document as they relate to Ally Financial and Dealer, at any time without prior notice. Ally Bank may terminate this Agreement as it relates to Ally Bank and Dealer, or the terms of any individual Retail and Lease Document as they relate to Ally Bank and Dealer, at any time without prior notice. This Agreement will terminate in its entirety if both Ally Financial and Ally Bank terminate. Dealer may terminate this Agreement as it relates to Ally Financial, Ally Bank, or both Ally Financial and Ally Bank by providing at least ten (10) days written notice to Ally Financial, Ally Bank, or both Ally Financial and Ally Bank, as the case may be.

**Section 14.** Modification. Ally Financial may modify, add to, and/or delete any of the terms and conditions of this Master Agreement and/or any of the Retail and Lease Documents as they relate to Ally Financial by an agreement signed by Ally Financial and Dealer, a dealer letter from Ally Financial, or any other reasonable written or electronic notice to Dealer. Ally Bank may modify, add to, and/or delete any of the terms and conditions of this Master Agreement and/or any of the Retail and Lease Documents as they relate to Ally Bank by an agreement signed by Ally Bank and Dealer, a dealer letter from Ally Bank, or any other reasonable written or electronic notice to Dealer. The continued provision of Retail and Lease Accommodations after

Ally Financial and/or Ally Bank gives notice of revised terms and conditions is conditioned on Dealer's acceptance of the revised terms and conditions. Any request by Dealer for a Retail or Lease Accommodation after such notice constitutes Dealer's agreement to be bound by the revised terms and conditions.

**Section 15.** Inspections and Financial Statements. Ally may inspect Dealer's books and records, including the files of customers whose applications are submitted to Ally or whose Contracts or Leases are assigned to Ally or an Ally affiliate, from time to time. Dealer shall provide Ally with such financial statements or other information that Ally may reasonably require from time to time.

**Section 16.** Notice by E-mail or Fax. Any notice to Dealer may be made by e-mail or fax. Ally will address notices it faxes to Dealer at the fax number that Dealer provides Ally on Dealer's user profile. The notice is deemed given 24 hours after a fax or e-mail is sent, unless Ally is notified that the transmission was incomplete or the delivery otherwise failed. Ally may also give notice by posting notice on any website related to the Retail and Lease Accommodations. Dealer consents, for the purposes of the Junk Fax Prevention Act of 2005 and any similar laws requiring consent, to receive faxes, including faxed advertisements, to any fax telephone numbers provided by Dealer. This consent remains in effect until Dealer cancels it in writing.

**Section 17.** Customer Information.

(a) Confidentiality. Dealer will treat Consumer Information as confidential and will not disclose or use Consumer Information other than as necessary to carry out the purposes for which Ally furnished Consumer Information to Dealer. Dealer will limit access to Consumer Information to only those people who need to know. Consumer Information to perform their functions pursuant to Dealer's agreements with Ally. This confidentiality provision does not apply to any information that (a) is publicly available by other than a breach of this agreement, (b) is disclosed to Dealer by a third party, other than an Ally affiliate or service provider, that Dealer reasonably believes is legally entitled to disclose such information, (c) was known by Dealer before the earlier of its receipt (i) from Ally or (ii) from an Ally affiliate or service provider, (d) is developed by Dealer independently of any disclosures of such information that Ally or an Ally affiliate or service provider previously made to Dealer, (e) is disclosed with Ally's prior written consent, or (f) is required to be disclosed by law,

GAGCGG_AMSTRLTWLVC (09/15)

provided that before such disclosure by Dealer, Dealer gives Ally reasonable notice and an opportunity to object to disclosure.

**(b)** Security. Dealer will take all necessary technical and organizational precautions to ensure that Consumer Information is protected from unauthorized access, alteration, disclosure, erasure, manipulation, and destruction by third parties while Consumer Information is in the possession or under the control of Dealer and ensure that Consumer Information is not processed in other ways contradictory to privacy and/or data protection laws. Upon written request, Dealer will provide Ally with all information that Ally reasonably requests regarding the processing of Consumer Information, including, but not limited to, where and how Consumer Information is stored, who has access to Consumer Information and why, and what security measures are taken to ensure that Consumer Information is protected from unauthorized access, alteration, disclosure, erasure, manipulation, and destruction while in the possession or under the control of Dealer. Dealer will maintain sufficient procedures to detect and respond to security breaches involving Consumer Information. Dealer will inform Ally as soon as practicable when Dealer suspects or learns of malicious activity or any other security breach involving Consumer Information and take corrective action. Dealer will provide Ally with such information regarding the malicious activity or breach as Ally reasonably requests.

**(c)** Disposal. Upon the earlier of Ally's request, completion of the work in connection with which Ally disclosed Consumer Information, or upon the cessation of the services or termination of services, Dealer will return Consumer Information to Ally or destroy it as instructed by Ally. If Ally directs Dealer to destroy the records and files containing Consumer Information, all such paper records will be shredded and all such electronic or digital records and files will be erased or otherwise rendered unreadable, in a way that prevents the records and files from being practicably read or reconstructed. Dealer will promptly confirm to Ally the destruction of said records and files. Upon request, Dealer will provide Ally all information that Ally reasonably requests regarding the disposal of records and files containing Consumer Information, including but not limited to such portions of the Dealer's information security policies and procedures as Dealer can provide without compromising the security of Consumer Information. Dealer will cause its employees, agents, and representatives to comply with the provisions of this agreement. Dealer accepts Ally's right to terminate Dealer's services

immediately without notice and with no indemnity by Ally if Dealer violates this Section or privacy or data protection laws.

**Section 18.** Damages Limitation. IN NO EVENT IS ALLY FINANCIAL OR ALLY BANK LIABLE TO DEALER FOR LOST PROFITS OR ANY SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OF ANY TYPE OR NATURE WHATSOEVER, ARISING OUT OF OR IN CONNECTION WITH THE MASTER AGREEMENT OR ANY OF THE RETAIL AND LEASE DOCUMENTS.

**Section 19.** Prior Agreements. The provisions of this Agreement supersede any and all previous agreements between Ally Financial and Dealer and/or Ally Bank and Dealer regarding the subject matter addressed in the Agreement.

**Section 20.** Authority of Dealer Representatives. Ally and its affiliates may rely in good faith on the authority of agents, employees, officers and other representatives of Dealer and on the genuineness of any purported signature or communication from such persons.

**Section 21.** Waiver of Notice. Dealer waives notice of acceptance of any guarantee in the Agreement and notices of non-payment and non-performance.

**Section 22.** Ally Forms. If Ally Financial or Ally Bank provides Dealer with any form documents, Ally Financial and Ally Bank assume no liability and make no representation or warranty, expressed or implied, with respect to those forms.

**Section 23.** Limited Power of Attorney. Dealer hereby appoints Ally as its attorney in fact and grants Ally a limited power of attorney to sign documents related to a Retail or Lease Accommodation on Dealer's behalf, as Ally deems necessary or appropriate to enforce this Agreement or Ally's legal rights ("Ally Power of Attorney"). This limited Ally Power of Attorney continues until all of Dealer's obligations under this Agreement (including those surviving termination) have been fulfilled. This Ally Power of Attorney is in addition to, and does not supersede, any other power of attorney or authorization granted to Ally by Dealer.

**Section 24.** Customer Payments. Dealer shall forward to Ally any payment on any Contract or Lease purchased by Ally received by Dealer, along with any necessary endorsements.

**Section 25.** No Oral Modification. No oral modification or waiver of the Agreement is valid.

**Section 26.** Severability. Any provision of this Agreement prohibited by law or unenforceable shall be ineffective only to the extent of such prohibition or unenforceability.

GAGCGG_AMSTRLTWLVC (09/15)

Section 27. Survival. Except as otherwise provided, termination of the Agreement or any Individual Retail and Lease Document shall not terminate the rights or obligations of a party relating to (i) any application submitted for Ally's consideration or Contract or Lease submitted to Ally for purchase prior to termination, (ii) any requirement to protect the privacy or confidentiality of information, or (iii) any indemnification or repurchase obligation.

Section 28. Set Off. Ally and its affiliates, to the fullest extent permitted by law, may offset and apply any funds, credits, or other amounts owing to Dealer or any property of Dealer in Ally's or an affiliate's

possession or control, including (but not limited to) Dealer's DFI Account, against any obligation of Dealer to Ally or its affiliates.

Section 29. Credit Card Programs. Notwithstanding section 6(i) of Exhibit 1 (Ally Retail Plan) and section 7(h) of Exhibit 4 (Ally Lease Plan), Ally may purchase Contracts and/or Leases from Dealer with a credit card downpayment or capitalized cost reduction if that payment meets the terms of a then currently effective program.

Section 30. Governing Law. Federal law and New York law apply to this Agreement.

**DEALER**

Dealer Name:   Bayview Auto Sales, LLC

Address: 94-267 Leokane St

Waipahu, HI 96797

FEIN: 45-5295800

Signature: _____

By (print): Edward J. Chaughnessy

Title: CEO/OWNER

Date: 08.09.2016

By: **ALLY FINANCIAL INC.**

By: **ALLY BANK**

GAGCGG_AMSTRLTWLVC (09/15)

Exhibit 1

## ALLY RETAIL PLAN

Ally may purchase retail Installment contracts ("Contracts") between Dealer and a retail buyer (a "Buyer") from Dealer, subject to terms and conditions set forth below and the other terms of the Agreement:

**Section 1. Sale and Purchase of Contracts.** Ally may purchase Contracts offered by Dealer if acceptable to Ally at a buy rate established from time to time by Ally.

**Section 2. Dealer Finance Income: DFI Account.** Ally shall credit Dealer's DFI Account for any DFI earned on eligible Contracts. Unless otherwise provided, DFI shall be calculated based on the finance charges attributable to any difference between Ally's buy rate and the Contract rate or a percentage thereof, subject to any caps, limitations, or other conditions set by Ally. Ally may debit Dealer's DFI Account for any amounts owed by Dealer to Ally, including (but not limited to) amounts owed by Dealer because of Contract prepayments. Unless otherwise agreed, Ally shall settle Dealer's DFI Account monthly (subject to reasonable adjustments) by depositing any positive balance in Dealer's ACH Account and withdrawing any negative balance from Dealer's ACH Account. If, at any time, Dealer's DFI Account has a negative balance, Dealer shall pay such balance immediately upon demand. If Ally determines, in its sole discretion, that the vehicle securing a Contract should be repossessed and the Contract was consummated no more than twelve (12) months before such determination, then Dealer shall pay to Ally the lesser of (i) the DFI credited to Dealer for that Contract or (ii) the loss Ally incurred for that Contract.

**Section 3. Dealer Subvention.** If Dealer submits a Contract with a contract rate that is less than the applicable buy rate ("Dealer Subvention"), Dealer shall pay to Ally an amount equal to the finance charges attributable to the difference between the buy rate and the Contract rate. Ally may debit the Dealer's DFI Account for any amounts owed to it for Dealer Subvention.

(a) Rebates. Unless expressly agreed otherwise, Dealer Subvention adjustments are rebatable in the event the transaction is paid in full before maturity.

(b) Cash Price. Dealer represents and warrants that the cash price stated in the retail installment sale contract will accurately reflect the price the Buyer would pay if he/she were to buy for cash. Dealer will not directly or indirectly cause or allow Dealer Subvention to be charged or passed along to any individual credit customer in contravention of applicable Law. Dealer will treat the expense paid to Ally for subvention as other dealership overhead

expenses, and will not charge it solely to credit customers.

**Section 4. Registration and Titling.** Dealer shall promptly register and title vehicles sold pursuant to a Contract in a manner sufficient to perfect in Ally's favor a valid and enforceable first priority security interest in the vehicle. Dealer shall promptly complete the necessary forms and documents at the time of sale and forward them together with the appropriate fees to those public officials who are responsible for issuing the certificate of title or registration. If a first priority security interest in the vehicle is not perfected within ninety (90) days of Contract consummation, Dealer shall accept reassignment of the Contract and pay the full amount of the unpaid balance under the Contract to Ally upon demand.

**Section 5. Physical Damage Insurance.** Unless prohibited by law, there must be physical damage insurance in the name of the Buyer and otherwise acceptable to Ally covering the vehicle referred to in a Contract against fire, theft and collision. If Dealer does not furnish complete and accurate information about insurance to Ally at the time Ally purchases the Contract, Dealer shall be responsible for any loss that would have been covered by required insurance, except that Ally will assume responsibility for any uninsured losses occurring after twelve (12) months from the date of the Contract.

**Section 6. Dealer Warranties and Representations.** With respect to each Contract submitted to Ally, Dealer warrants and represents:

(a) The Contract conforms to the application approval communicated by Ally, the Application Information submitted to Ally, and to any applicable Ally Bulletins;

(b) The Contract arose from the bona fide sale of the vehicle described on the face of the Contract;

(c) Dealer had good and marketable title to the vehicle at the time of sale free of any liens or encumbrances, except liens in favor of Ally;

(d) All disclosures required by applicable Law were properly made to the Buyer prior to the Buyer signing the Contract and in accordance with applicable Law;

(e) The advertisement, solicitation, and sale of the vehicle described on the face of the Contract and any related aftermarket product complied with applicable Law;

GAGCGG_AMSTRI.TWLVC (09/15)

Exhibit 1

(f)   All insurance documentation will be delivered to the Buyer within the time required by applicable Law;

(g)   To the best of Dealer's knowledge, all Application Information submitted is accurate;

(h)   Each signature on the Contract and on each other document executed in connection with the Contract is the genuine signature of the person whose signature it purports to be;

(i)   The downpayment received by Dealer is exactly as stated and was not paid with credit;

(j)   Dealer has remitted funds sufficient to pay in full any prior extension of credit or prior lease balance related to any "trade in" made in connection with the Contract;

(k)   The Contract accurately describes the Contract vehicle, the vehicle's actual cash sale price, any "trade in" value, and contains all representations, warranties, and agreements made by the Dealer to the Buyer with respect to the Contract vehicle;

(l)   No party to the Contract or a related document was in default at the time of assignment;

(m)   The Contract's negotiation and execution complied with applicable Law;

(n)   The vehicle described in the Contract has not been subject to a "lemon law" buyback or repurchase right and has never been represented, or required to be represented, by a salvage, flood or branded title;

(o)   The Contract is enforceable according to its terms, and all fees, charges, and other amounts provided for in the Contract comply with applicable Law; and

(p)   Dealer is licensed as required by applicable Law.

**Section 7. Repurchase.**   If any warranty or representation above or any term in the Agreement is breached, Dealer shall, upon demand, accept assignment of any Contract related to such breach and pay to Ally the full amount of the unpaid balance under the Contract, the unearned portion of any DFI paid in connection with the Contract, and reimbursement for any repossession expenses incurred. Ally has no duty to repossess or transfer a vehicle to Dealer as a condition of a Contract repurchase. If Ally does sell or transfer the vehicle, Dealer takes that vehicle "AS IS", "WHERE IS", and without any warranty.

**Section 8. Indemnification.**   Dealer shall indemnify Ally for all Losses that Ally incurs due to (i) breach of any representation or warranty above, (ii) breach of any term or covenant contained in the Agreement, (iii) any

Contract being rescinded, declared unenforceable, or voided by a court or an arbitrator, and (iv) any claim or defense asserted against Ally because of any act or omission by Dealer.   Furthermore, Dealer shall indemnify Ally for all Losses arising from, any action, claim, suit, order, fine, judgment, or settlement relating to any express or implied warranties to the vehicle sold under a Contract.

**Section 9. Aftermarket Products.**

(a)   Approval.   Aftermarket products, such as optional insurance, maintenance, service, or other contracts, are eligible for financing if the product, administrator, and product agreement forms have been approved by Ally.  Dealer shall not submit Contracts including aftermarket products that Ally has not approved.

(b)   Refund of Unearned Charges.   Dealer agrees that upon prepayment, repossession, or total loss, Dealer shall refund any unearned charges for aftermarket products to the Buyer or Ally, as appropriate.  In the case of prepayment, unless applicable law requires Ally to process such refunds, this is accomplished either by notifying the customer to make application to Dealer for the refund, or by Dealer authorizing Ally to make the refund on Dealer's behalf.  When there is repossession, total loss, or in those jurisdictions where applicable law requires Ally to process such refunds, Dealer authorizes Ally to debit Dealer's DFI Account for the unearned charges.

(c)   Customer Disputes.   If a Contract includes a charge for extended warranty protection or for a service contract offered by or through Dealer, the Dealer agrees to repurchase the Contract upon demand pursuant to Section 7 of this document if a claim or defense is asserted under the warranty or service contract and Dealer does not resolve the dispute with the Buyer within ninety (90) days of the oldest unpaid installment.

**Section 10. Nonrecourse.**   Except as otherwise provided in this Agreement, an Ally Bulletin, or other agreement between the parties, Dealer shall not be responsible to Ally for any default by a Buyer with respect to a Contract.

**Section 11. Miscellaneous.**

(a)   The termination of the Agreement or this exhibit shall not release Ally Financial, Ally Bank, or Dealer from any obligations arising from Contracts submitted or purchased prior to termination.

(b)   Any waiver, compromise, settlement, or variation of the terms of the Contract releasing a retail buyer shall not release Dealer or otherwise limit Dealer's liability.

GAGCGG_AMSTRLTWLVC (09/15)

Exhibit 2

## SUBMISSION OF APPLICATIONS TO ALLY

Ally may accept application and other transaction information ("Application Information") related to retail purchase and lease transactions ("Retail Transactions") that Dealer asks Ally to consider for possible purchase by Ally, subject to terms and conditions set forth below and the other terms of the Agreement:

**Section 1. Dealer Recordkeeping.** For each Retail Transaction submitted to Ally, Dealer shall obtain the applicants' signatures on an application form approved by Ally. Dealer will ensure that such application forms accurately reflect the Application Information submitted to Ally in the related Retail Transactions. Dealer will retain, on its own behalf and on Ally's behalf, such application forms, any other records or information related to such applications, and records of applicants' information sharing elections (see below) in compliance with applicable state and federal law, including without limitation, the Federal Equal Credit Opportunity Act and similar state statutes, and, in compliance with retention requirements established by Ally from time to time in its discretion. Upon request, Dealer will promptly provide Ally a copy of the signed application form, and any other records or information related to an application submitted to Ally.

**Section 2. Application Disclosures.** Before submitting Application Information to Ally, Dealer shall provide the following notice in writing to all applicants in the related Retail Transaction: "Your application will be submitted to Ally Financial and Ally Bank (a/k/a Ally Capital in Hawaii, a/k/a Ally Bank Corp. in New Mexico, a/k/a Ally Capital Corp. in Arizona, Mississippi, Montana, New Jersey, and Wisconsin), both at P.O. Box 33414, Detroit, MI 48232, so that they may decide whether or not to purchase the transaction." Ally may update this notice from time to time by providing written or electronic notice to Dealer. Dealer also shall provide to applicants any disclosures required by applicable Law and a copy of the completed application if the applicable Law or Ally requires it.

**Section 3. Dealer's Use of an Online Service.** Ally Financial and/or Ally Bank, in their sole discretion, may accept Application Information through one or more third party online services, such as RouteOne or DealerTrack (each a "Service"). Dealer acknowledges and agrees that: (1) Ally Financial and Ally Bank assume no liability or responsibility for the Service, even in circumstances where Ally Financial or Ally Bank (or an affiliate) may serve as host of a website through which Dealer may access the Service; (2) Dealer's rights and remedies regarding the Service are limited to those provided by Dealer's arrangements with the provider of the Service; and (3) Dealer is solely responsible for any fees, charges, or expenses charged

to Dealer by the provider of the Service or others in conjunction with Dealer's use of the Service, even if Dealer accesses the Service through a website hosted by Ally Financial or Ally Bank (or an affiliate).

**Section 4. Ally Application Website.** Ally Financial and/or Ally Bank, in their sole discretion, may host (or have an affiliate host) one or more websites through which Dealer may submit applications, either through a Service or directly to Ally Financial and/or Ally Bank (each a "Ally Application Website").

(a) Terms & Conditions. By using an Ally Application Website, Dealer agrees to any terms and conditions posted on the website. In addition to Ally Financial's and/or Ally Bank's rights under this Agreement. Dealer's continued use of an Ally Application Website or submission of Retail Transactions to Ally Financial and/or Ally Bank after Ally Financial and/or Ally Bank gives notice of revised terms and conditions is conditioned on Dealer's acceptance of those revised terms and conditions. Any use by Dealer of the Ally Application Website to submit Retail Transactions to Ally Financial and/or Ally Bank after such notice constitutes Dealer's agreement to be bound by the revised terms and conditions. Ally Financial and Ally Bank, in their sole discretion and at any time without notice, may modify the features of any Ally Application Website or cease hosting such website.

(b) Technical Support. Ally Financial and/or Ally Bank may provide technical support related to the use of an Ally Application Website. Ally Financial and Ally Bank reserve the right, in their sole discretion and at any time without notice, to modify the technical support provided with respect to any Ally Application Website.

(c) NO WARRANTY. ALLY FINANCIAL, ALLY BANK, AND THEIR AFFILIATES PROVIDE ANY ALLY APPLICATION WEBSITE, ANY RELATED WEBSITES, AND ANY TECHNICAL SUPPORT "AS IS" AND WITHOUT ANY WARRANTY OR CONDITION, EXPRESS OR IMPLIED. Ally AND ITS AFFILIATES SPECIFICALLY DISCLAIM ALL IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, AND FITNESS FOR A PARTICULAR PURPOSE.

(d) Service Interruptions. Ally Financial and Ally Bank are not responsible for any service interruptions in connection with an Ally Application Website.

(e) Proprietary Rights. Ally Financial and Ally Bank retain full ownership of each Ally Application

Exhibit 2

Website, and any trademarks, service marks, or patented business processes contained therein ("Ally Intellectual Property"). Dealer acknowledges that applicable copyright and other proprietary rights and laws protect Ally Intellectual Property. Except as expressly authorized by Ally Financial and Ally Bank, Dealer will not sell, license, rent, modify, distribute, reproduce, transmit, publicly display, publish, adapt or create derivative works from Ally Intellectual Property.

(f) System Integrity. Dealer shall not use any device, software, unauthorized human intervention or routine to interfere or attempt to interfere with the proper working of any Ally Application Website. Dealer may not take any action that imposes an unreasonable or disproportionately large workload on any Ally Application Website or Ally's systems or infrastructure. Ally Financial and Ally Bank may immediately suspend Dealer's use of any Ally Application Website without notice to avoid any such interference with the proper working of any Ally Application Website, or an unreasonable or disproportionately large workload on any Ally Application Website or Ally's systems or infrastructure.

(g) Passwords and Security. Dealer may not improperly use, disclose to, or share with any third parties Dealer's password for use of any Ally Application Website. Dealer is entirely responsible for maintaining the confidentiality of Dealer's password and for requesting any changes to Dealer's password necessary to protect confidentiality or otherwise prevent unauthorized use. Dealer is entirely responsible for any and all activities that occur using Dealer's password, whether authorized or unauthorized. Dealer shall notify Ally immediately of any unauthorized disclosure or use of Dealer's password or any other breach of security. Dealer indemnifies and holds Ally harmless for any loss Ally or Dealer suffers because of Dealer's failure to safeguard the confidentiality of Dealer's password or otherwise prevent unauthorized use of any Ally Application Website.

(h) Dealer Eligibility. Dealer must be properly licensed and in good standing with Ally Financial and Ally Bank to access an Ally Application Website, and Ally Financial and Ally Bank may, in their sole discretion, refuse to accept Application Information from Dealer and/or block access to any Ally Application Website.

Section 5. Privacy Notice. For each Retail Transaction submitted to Ally, before obtaining the applicants' signature on the related credit application, if requested by Ally Financial and/or Ally Bank, Dealer will (1) give

the applicants a copy of the written Ally Privacy Notice in the form approved by Ally Financial and/or Ally Bank and (2) accurately and properly record any election by the applicants regarding information sharing pursuant to the applicable Ally Privacy Notice as instructed by Ally Financial and/or Ally Bank. Dealer will retain documentation of the applicants' information sharing elections along with the application form pursuant to Section 1 of this Agreement.

Section 6. Ally Use of Pre-submission Information. If Dealer and Ally Financial and/or Ally Bank have entered into a joint marketing agreement, then Ally Financial and/or Ally Bank may access some or all Application Information through an Ally Application Website whether or not Dealer submits the related Retail Transaction to Ally ("Pre-submission Information"). Ally Financial and Ally Bank shall use Pre-submission Information only as applicable Law permits.

Section 7. Confidentiality. Some Pre-submission Information may be nonpublic personal information as defined in Part 313 of Title 16 of the Code of Federal Regulations ("Non-public Personal Information"). Ally Financial and Ally Bank agree not to disclose or use Non-public Personal Information except (1) to assist the Dealer in marketing and promoting products or services related to Retail Transactions that Dealer could submit to Ally Financial and Ally Bank, (2) to perform services for Dealer, or (3) as otherwise permitted by applicable Law.

Section 8. Ally Security. Ally Financial and Ally Bank will employ commercially reasonable technical and organizational precautions to ensure that Non-public Personal Information is protected from unauthorized access, alteration, disclosure, erasure, manipulation, and destruction by third parties while Non-public Personal Information is in the possession or under the control of Ally Financial and Ally Bank and ensure that Non-public Personal Information is not processed in other ways contradictory to applicable law. Ally will provide Dealer with all information Dealer reasonably requests regarding the processing of Non-public Personal Information.

Section 9. Limits on the Applicability of Sections 7 and 8. Dealer acknowledges that the restrictions imposed on Ally Financial and Ally Bank in Sections 7 and 8 of this document do not apply to Application Information related to Retail Transactions that Dealer submits to Ally Financial or Ally Bank even if some or all of the information was previously Pre-submission Information subject to these sections. Dealer acknowledges that Ally Financial and Ally Bank may use Application Information related to Retail Transactions submitted to Ally in any manner allowed by Law.

GAGCGG_AMSTRETWLVC (09/15)

Exhibit 3

## JOINT MARKETING AGREEMENT

WHEREAS, Dealer originates motor vehicle retail installment sale contracts and leases with consumers and may seek to assign them to Ally Financial or Ally Bank,

WHEREAS, Ally Financial and Ally Bank do not enter into motor vehicle retail installment sale contracts and leases directly with consumers, but instead seeks to acquire such contracts and leases from dealers and then service those contracts and leases under brand names identified with Ally Financial and Ally Bank.

WHEREAS, Dealer, Ally Financial, and Ally Bank market, promote, and endorse Ally financing and leasing.

WHEREAS, Ally Financial and Ally Bank desire to share information permitted by Section 6802(b)(2) of the United States Code or regulations implementing that section with Dealer,

NOW, THEREFORE, Dealer, Ally Financial, and Ally Bank enter into this Joint Marketing Agreement ("JMA");

**Section 1.** Sharing and Use of Information. From time to time, Ally Financial and/or Ally Bank may disclose to Dealer, for use in marketing and promoting retail installment sale contracts or leases that Dealer may seek to assign to Ally Financial and/or Ally Bank, nonpublic personal information as defined in Section 6809(4) of the United States Code or regulations implementing that statute ("Information"). Ally Financial's and/or Ally Bank's disclosures to Dealer pursuant to this JMA may include, but are not necessarily limited to, Information that pertains to consumers whom Ally Financial and/or Ally Bank has preapproved for Ally financing or leasing, and Information that pertains to current or recent customers of Ally Financial and/or Ally Bank, such as their status as Ally customers. In consideration of receipt of Information, Dealer agrees not to disclose or use the Information except (1) as necessary to market, promote, or endorse Ally financing or leasing, or (2) under an exception in Section 6802(e) of the United States Code (or regulations implementing that section) in the ordinary course of business to carry out the marketing, promotion, or endorsement of Ally Financial or Ally Bank financing or leasing. This provision does not apply to disclosures that Ally Financial and/or Ally Bank make to Dealer with the consent of or at the direction of the affected consumers, or to Dealer's disclosure and use of Information as applicable Law otherwise permits.

**Section 2.** No Obligation to Share Information. This JMA does not obligate Ally Financial or Ally Bank to disclose any Information to Dealer. Disclosure of Information to Dealer is at the sole discretion of Ally Financial or Ally Bank (as the case may be),

**Section 3.** Ally Intellectual Property. Dealer acknowledges that Ally owns or licenses: various names, logos, trademarks, trade dress, service marks, copyrights, and other intellectual property ("Marks") that are used in connection with motor vehicle retail installment sale contracts or leases. Ally grants Dealer a limited, non-exclusive, non-transferable right to display such Marks only in the form and manner approved by Ally and solely in connection with Dealer's marketing, advertising, and promotional activities related to the procurement of retail installment sale contracts and leases pursuant to this JMA. Dealer agrees to follow any guidelines related to the use of Marks that Ally may provide or make available to Dealer from time to time. Dealer may not use the Marks as part of the Dealer name or as part of an internet domain name (*i.e.*, a URL), or in keywords, meta tags, or other in any other similar manner without Ally's prior written consent. Upon termination or expiration of this JMA, Dealer will immediately cease all use of the Marks and thereafter, will not use, either directly or indirectly, any Marks or any other confusingly similar marks in a manner that Ally determines is likely to cause confusion or mistake or deceive the public, and will immediately assign any domain names it has registered that include any Marks of Ally. This JMA does not grant Dealer any right or license to sell, or otherwise distribute for sale, any promotional, advertising, or novelty items bearing the Marks,

**Section 4.** No Agency or Representative Relationship. This JMA does not make any party the agent or legal representative of another for any purpose. Nor does it grant either party any authority to assume or create any obligation on behalf of or in the name of another party. Each party is responsible for ensuring the legal compliance of its own advertising.

Exhibit 4

## ALLY LEASE PLAN

Ally may purchase closed-end lease agreements ("Leases") between a lessee ("Lessee") and Dealer, and the vehicles described therein ("Vehicles") from Dealer, subject to terms and conditions set forth below and the other terms of the Agreement:

**Section 1. Sale and Purchase of Leases and Vehicles.** Ally may purchase Leases and Vehicles offered by Dealer if acceptable to Ally. The Leases must be for eligible Vehicles as defined below. Maintenance leases are not eligible for purchase.

**Section 2. Eligible Vehicles.** Except as otherwise provided in an Ally Bulletin, eligible Vehicles are new passenger cars and light trucks up to 15,000 pounds GVW that are listed in the Residual Value Lease Guide approved by Ally and such used vehicles as Ally may designate. Vehicles that will be sub-leased, rented, or used for hire or as public conveyances are not eligible.

**Section 3. Lease Pricing.** Dealer agrees that Leases will be priced using the residual value factor for the make and model of the Vehicle (including options) listed in the Residual Value Lease Guide approved by Ally and in effect at the time. Ally may modify such factors from time to time, in which case Leases shall be priced using the modified factor.

**Section 4. Vehicle Purchase Price.** The price for eligible Leases and Vehicles Ally purchases shall not exceed such limit as Ally may from time to time establish, plus compensation for Dealer-installed options acceptable to Ally. The price for such options shall not exceed limits that Ally may establish from time to time.

**Section 5. Registration and Titling.** Dealer shall promptly register and title Vehicles in Ally's name or as Ally otherwise instructs. Dealer shall promptly complete the necessary forms and documents at the time of Lease signing and forward them, together with the appropriate fees, to the public officials who are responsible for issuing the certificate of title or registration. If a Vehicle is not titled and registered as instructed within ninety (90) days of Lease consummation, Dealer shall accept reassignment of the Lease and pay the full amount of the unpaid balance under the Lease to Ally upon demand.

**Section 6. Insurance.** Unless otherwise approved by Ally, Vehicles must be covered by (1) public liability insurance with minimum limits that Ally will establish from time to time, and (2) physical damage coverage with deductibles not to exceed amounts that Ally will establish from time to time. Such coverages must be maintained for the term of the Lease through a carrier acceptable to Ally.

(a) Appropriate evidence of such coverages must be provided to Ally. The policy of public liability insurance must show Ally as an additional insured. The policy of physical damage insurance must show Ally as loss payee.

(b) Dealer shall furnish Ally with complete and accurate information about insurance when Ally purchases the Lease and Vehicle. If Dealer does not furnish complete and accurate information about insurance to Ally at the time Ally purchases the Lease and Vehicle, Dealer shall be responsible for any loss that would have been covered by required insurance, except that Ally will assume responsibility for any uninsured losses occurring after twelve (12) months from the date of the Lease.

**Section 7. Dealer Warranties and Representations.** With respect to each Lease submitted to Ally, Dealer warrants and represents:

(a) The Lease conforms to the application approval communicated by Ally, the Application Information submitted to Ally, and to any applicable Ally Bulletins;

(b) The Lease arose from the bona fide lease of the property described on the face of the Lease;

(c) Dealer has the right to convey good and marketable title to the Vehicle at the time of lease free of any liens or encumbrances;

(d) All disclosures required by applicable Law were properly made to the Lessee before the Lessee signed the Lease;

(e) All documentation related to insurance sold or provided by Dealer will be delivered to the Lessee within any time required by applicable Law;

(f) To the best of Dealer's knowledge, all Application Information submitted is accurate;

(g) Each signature on the Lease and on each other document executed in connection with the Lease is the genuine signature of the person whose signature it purports to be;

(h) The cash capitalized cost reduction received by Dealer is exactly as stated and was not paid with credit;

(i) The Lease's negotiation and execution complied with applicable Law;

(j) The Lease is enforceable according to its terms, and all fees, charges, and other amounts provided for in the Contract comply with applicable Law; and

GAGCGG_AMSTRLTWLVC (09/15)

Exhibit 4

**(k)** Dealer is licensed as required by applicable Law.

**Section 8.** Repurchase.    If any warranty or representation above or any term in the Agreement is breached, Dealer shall, upon demand, accept assignment of any Lease and Vehicle related to such breach and pay to Ally the full amount unpaid under the Lease (adjusted for unearned lease charges) plus the original estimate of the Vehicle's value at the scheduled end of the Lease as stated in the Lease, the unearned portion of any DFI paid in connection with the Lease, and reimbursement for any repossession expenses incurred.  In Ally's sole discretion, it may sell the Vehicle to a third party rather than transferring it to dealer as part of the reassignment. If Ally does transfer the Vehicle, Dealer takes that vehicle "AS IS", "WHERE IS", and without any warranty.

**Section 9.** Indemnification.    Dealer shall indemnify Ally for all Losses that Ally incurs due to (i) breach of any representation or warranty above; (ii) breach of any term or covenant contained in the Agreement, (iii) any Lease being rescinded, declared unenforceable, or voided by a court or an arbitrator, and (iv) any claim or defense asserted against Ally because of any act or omission by Dealer.    Furthermore, Dealer shall indemnify Ally for all Losses arising from, any action, claim, suit, order, fine, judgment, or settlement relating to any express or implied warranties to the Vehicle leased under a Lease.

**Section 10.** Aftermarket Products.

**(a)** Approval.    Aftermarket products, such as optional insurance, maintenance, service, or other contracts, are eligible for financing if the product, administrator, and product agreement forms have been approved by Ally.  Dealer shall not submit Leases including aftermarket products that Ally has not approved.

**(b)** Refund of Unearned Charges.  Dealer agrees that upon prepayment, repossession, or total loss, Dealer shall refund any unearned charges for aftermarket products to the Buyer or Ally, as appropriate.   In the case of prepayment, unless applicable law requires Ally to process such refunds, this is accomplished either by notifying the customer to make application to Dealer for the refund, or by Dealer authorizing Ally to make the refund on Dealer's behalf.  When there is repossession, total loss, or in those jurisdictions where applicable law requires Ally to process such refunds, Dealer authorizes Ally to debit Dealer's DFI Account for the unearned charges.

**(c)** Lessee Disputes.  If a Lease includes a charge for extended warranty protection or for a service

contract offered by or through Dealer, Dealer agrees to repurchase the Lease and Vehicle from Ally upon demand for the full amount unpaid under the Lease (adjusted for unearned lease charges), plus the original estimate of the Vehicle's value at the scheduled end of the Lease as stated in the Lease, if a claim or defense is asserted under the warranty or service contract and Dealer does not resolve the dispute with the Lessee within ninety (90) days of the oldest unpaid monthly payment.

**Section 11.** End of Lease Processing.

**(a)** Vehicle Return.  If the Vehicle is not purchased by either Lessee or Dealer, Dealer shall (i) immediately notify Ally of the Vehicle's return, and (ii) comply with all Ally instructions regarding processing the Vehicle's return.  If Dealer prepares a vehicle condition report and such report does not disclose excessive wear and use, body damage, glass damage, missing equipment, or excess mileage that a reasonable inspection would have discovered, Dealer shall be responsible for the first $1,000 loss that Ally may suffer as a result.

**(b)** Storage.  Dealer will, at Ally's option, provide Ally safe storage of returned Vehicles at no charge for a period not to exceed 30 days.  During such time, stored vehicles may be posted to SmartAuction^SM or other auction websites.  Dealer is not required to provide primary insurance coverage on stored Vehicles.  If, however, a Vehicle is damaged while in the possession of Dealer, Dealer is required to document the facts relating to the damage.  If a Dealer employee or any person authorized by Dealer is responsible for the damage, Dealer is required to file a claim under Dealer's garage-keeper's legal liability insurance policy.

**(c)** Lessee Purchase Option.  In the event a Lessee under a Lease assigned to Ally desires to exercise the option to purchase, Ally may, in its discretion, assign all right, title, and interest in the Lease and the Vehicle to Dealer.   As consideration for assignments that Dealer accepts, Dealer shall pay to Ally the option price less any dealer income increment that Ally may have included in the option price.

**Section 12.** Miscellaneous.

**(a)** The termination of the Agreement or this exhibit shall not release Ally Financial, Ally Bank, or Dealer from any obligations arising from Leases or Vehicles submitted or purchased prior to termination.

**(b)** Any waiver, compromise, settlement, or variation of the terms of the Lease releasing a Lessee shall not release Dealer or otherwise limit Dealer's liability.

Exhibit 5

## TERMS OF SALE FOR ALLY VEHICLES

WHEREAS, from time to time, Dealer may be in possession of vehicles owned by Ally Financial or Ally Bank including those that have been surrendered to Dealer by lessees upon scheduled maturity or early termination of a lease with Ally Financial or Ally Bank, and those that have been purchased by Ally Financial or Ally Bank from buyers under the provisions of certain of their retail installment sale contracts (collectively referred to as "Ally Vehicles," and singularly as "Ally Vehicle"),

WHEREAS, from time to time, Dealer may desire to purchase and Ally Financial and/or Ally Bank may desire to sell certain Ally Vehicles, and

WHEREAS, in arranging these sales, generally, Ally Financial or Ally Bank will quote Dealer a purchase price for an Ally Vehicle upon Dealer's request, and Dealer will indicate its willingness to purchase the Ally Vehicle at the quoted price (the "Proposed Agreement"). The parties recognize that there will often be uncertainty regarding the consummation of the Proposed Agreement. Thus, the parties agree that neither party should be bound by the Proposed Agreement until the time set forth below, notwithstanding any expressions of agreement or acceptance by either party that might occur prior to that time.

NOW THEREFORE, Dealer, Ally Financial, and Ally Bank agree as follows:

**Section 1. Definitions.**

*Ally* means, for the purposes of this Exhibit only, Ally Financial if Ally Financial owns the Ally Vehicle and Ally Bank if Ally Bank owns the Ally Vehicle.

*Dealer's Payment* means the receipt by Ally of forms of payment as Ally agrees to accept, and notification of the vehicle identification number of the Subject Vehicle for which payment is being made. At Ally's discretion, payment may include an offset of Dealer's floorplan financing obligation with Ally. Upon demand by Ally, Dealer shall make all payments in immediately available funds, cash, certified check, bank check, or as otherwise specified by Ally, notwithstanding Ally's prior acceptance of other forms of payment.

*Ally's Acceptance* means the first of the following to occur: (i) Passage of 5 business days from Ally's receipt of Dealer's Payment without Ally notifying Dealer of its objection to the amount or form of Dealer's Payment or its intent to reject the Proposed Agreement; or (ii) Ally's providing Dealer with title documentation necessary to transfer the Subject Vehicle's certificate of title to Dealer; or (iii) Ally's providing other written confirmation that it accepts the Proposed Agreement.

**Section 2. All Sales Subject to this Agreement.** All sales of Ally Vehicles to Dealer are subject to the terms and conditions set forth in this Agreement; provided that sales of Ally Vehicles to Dealer through an auction, such as SmartAuction[SM], also shall be governed by the terms of the auction. Only the identity of the particular Ally Vehicle to be sold (the "Subject Vehicle") and its price will vary in individual transactions.

**Section 3. Time of Effectiveness.** Both Ally and Dealer will be bound to the Proposed Agreement as soon as both Dealer's Payment and Ally's Acceptance have occurred ("Time of Effectiveness"). All of Ally's right, title, ownership and interest in the Subject Vehicle will transfer to Dealer at the Time of Effectiveness along with any risk of loss that remained with Ally prior to that time.

**Section 4. Rights and Obligations of Parties Prior to Time of Effectiveness.** Prior to the Time of Effectiveness, either party may reject or modify the Proposed Agreement without liability. Until the Time of Effectiveness, Ally shall retain all of its rights as owner of the Subject Vehicle, including without limitation: the right to demand or take possession of the Subject Vehicle; or to sell it to any other person. If Ally demands or takes possession of the Subject Vehicle, or gives notice to Dealer that the vehicle is to be sold to another person, Dealer shall be deemed to have reasonable notice from Ally that the Proposed Agreement has been rejected.

Dealer shall have no legal or equitable claim to or interest in any Ally Vehicle, including the Subject Vehicle prior to the Time of Effectiveness. Dealer's possession of Ally Vehicles, including its possession of the Subject Vehicle prior to the Time of Effectiveness, will be as voluntary bailee on behalf of Ally. Dealer shall not grant, sell, encumber or otherwise transfer any interest in any Ally Vehicle, including the Subject Vehicle prior to the Time of Effectiveness.

**Section 5. Storage of Ally Vehicles; Losses Arising from Dealer's Possession of Ally Vehicles.** Dealer shall, at Ally's option, provide Ally safe storage of Ally Vehicles at no charge for a period not to exceed 30 days.

Dealer is not required to provide primary insurance coverage on stored Ally Vehicles. If, however, any Ally vehicle is damaged while in the possession of Dealer, Dealer is required to document the facts relating to the damage.

If an employee of Dealer is responsible for the damage, Dealer is required to file a claim under Dealer's garage-keeper's legal liability insurance policy.

GAGCGG_AMSTRLTWLVC (09/15)

Exhibit 5

Dealer will be liable to Ally for any uninsured loss suffered by Ally related to any use or improper storage of an Ally Vehicle by Dealer, its employees or its customers, including without limitation, losses due to fire, theft, vandalism, mischief, collision, acts of God, property damage, personal injury, public liability or the like. Dealer will indemnify Ally for any such losses.

**Section 6. Presumption of Resale; Responsibility for Taxes.** All purchases of Ally Vehicles by Dealer are presumed to be for resale in the regular course of Dealer's business, unless Dealer provides advance written notice to Ally of a different purpose.

If an Ally Vehicle is purchased for other than resale, Dealer shall be liable for any sales, use or similar taxes and for any related penalties or interest. Dealer shall also be responsible for remitting such amounts directly to the applicable taxing authority.

**SECTION 7. NO EXPRESS OR IMPLIED WARRANTIES.**

ALLY MAKES NO WARRANTIES OR REPRESENTATIONS ABOUT THE PERFORMANCE ABILITY OF ANY ALLY VEHICLES, ABOUT THEIR STATE OF REPAIR, ABOUT THEIR CONDITION, MAINTENANCE OR REPAIR HISTORY OR ABOUT THEIR ABILITY TO FUNCTION IN ANY RESPECT.

FURTHER, THERE ARE NO IMPLIED WARRANTIES OF MERCHANTABILITY, OF FITNESS FOR PARTICULAR PURPOSE OR ANY OTHER EXPRESS OR IMPLIED WARRANTIES WITH RESPECT TO THE SALE OF ANY ALLY VEHICLES, SUCH WARRANTIES BEING HEREBY EXPRESSLY DISCLAIMED.

ALL ALLY VEHICLES WILL BE SOLD ON AN "AS IS" BASIS. DEALER ASSUMES THE ENTIRE RISK AS TO THE QUALITY AND PERFORMANCE OF ANY ALLY VEHICLES IT PURCHASES FROM ALLY. IF ANY ALLY VEHICLE PURCHASED PROVES DEFECTIVE, DEALER, NOT ALLY, SHALL ASSUME THE ENTIRE COST OF ALL NECESSARY SERVICING AND REPAIR AND LIABILITY FOR ANY OTHER LOSS DEALER MAY SUSTAIN AS A RESULT.

**Section 8. No Reliance on Ally Representations.** Dealer acknowledges that Ally generally will not have an opportunity to inspect an Ally Vehicle's condition prior to sale, and that any statements or representations made by Ally regarding Ally Vehicles will be without the benefit of such an inspection. Dealer further acknowledges that it will have opportunity to conduct a thorough inspection of the Ally Vehicle in its possession. Dealer will not rely upon or be induced to purchase any Ally Vehicle by statements or representations made by Ally with respect to such Ally Vehicle.

**Section 9. Transactions Through SmartAuction**[SM]. SmartAuction[SM] transactions also shall be subject to the SmartAuction[SM] Terms Of Use as they appear on the Ally SmartAuction[SM] website service on the date of the transaction. Conflicts between the Agreement and the SmartAuction[SM] Terms Of Use will be resolved in favor of the SmartAuction[SM] Terms Of Use.

GAGCGG_AMSTRLTWLVC (09/15)

Exhibit 6

## DEALER AUTHORIZATION TO ALLY TO WITHDRAW AND DEPOSIT FUNDS
## VIA COMMERCIAL BANK AUTOMATED CLEARING HOUSE TRANSACTIONS

Dealer hereby authorizes Ally from time to time to make withdrawals from and deposits to the account of Dealer identified below established at the depository institution named below ("Depository"), as well as any other account later established by Dealer at Depository as a replacement therefor ("ACH Account"). For all intents and purposes, Depository is deemed a depository financial institution and is authorized to initiate, process, and accept these withdrawals from and/or deposits to the ACH Account by use of electronic or other non-paper based means, and may use one or more automated clearing house to effectuate such credit and debit entries. The purpose of these withdrawals and/or deposits is strictly limited to effect payment of financial obligations between Ally and the Dealer as directed by Ally in accordance with the Agreement and any other agreements between Ally and Dealer.

Depository Name:  **First Hawaiian Bank**

Depository Address:  **98-1071 Moanalua Rd #2** , **Aiea**      **HI**      **96701**
                             Street                              City                  State           Zip

Name of Depository Representative:  **Steven Comes**       Phone:  **808 7384613**

Bank Routing Transit Number:  **121301015**       Type of Account:   ☑ Checking

Dealer Account #:  **81- 093628**       ☐ Other:
                                                             Specify

To confirm the above stated ACH Account information, Dealer hereby provides Ally with a copy of a voided check or deposit ticket for this ACH Account.

All ACH Account transactions made pursuant to this Agreement are subject to the Rules of the National Automated Clearing House Association, Article 4A of the Uniform Commercial Code, and all other applicable laws and regulations, as may be in force, from time to time. This authorization will remain in effect for not less than five days following receipt by Ally of written notice of termination.

GAGCGG_AMSTRLTWLVC (09/15)



# EXHIBIT B

| Contract Date | VIN | Outstanding Balance (as of November 2, 2023) |
|---|---|---|
| 1/11/2022 | 2B3CJ4DG6BH570576 | $   6,631.33 |
| 1/31/2022 | 3N1AB8CV1MY310421 | $  18,145.36 |
| 2/17/2022 | 1G6AS5SX5E0141551 | $   9,530.07 |
| 2/18/2022 | ZACCJADB3HPE48413 | $  16,300.02 |
| 4/1/2022 | 3N1AB7APXHY350677 | $  13,040.95 |
| 4/2/2022 | 19XFB2F83EE081782 | $  16,784.70 |
| 4/12/2022 | 5NPE34AF9FH214780 | $  11,862.28 |
| 4/28/2022 | 2C3CCAAG0EH379868 | $  17,189.23 |
| 5/3/2022 | 1FADP3L91EL315491 | $  10,111.68 |
| 5/13/2022 | KM8JU3AC2DU666385 | $  16,700.90 |
| 5/17/2022 | 19XFB2F52FE029809 | $  13,751.80 |
| 5/17/2022 | 1N6AD0EV3EN770102 | $  14,623.17 |
| 5/20/2022 | 2C3CCAAGXFH930793 | $  12,064.21 |
| 5/24/2022 | 1N4AZ0CP8EC332170 | $  15,212.30 |
| 5/24/2022 | 1C3CCCAB3GN121550 | $  10,591.65 |
| 5/25/2022 | 1C3CCBCG1EN191743 | $  12,978.22 |
| 6/6/2022 | 3N1AB7APXFL666171 | $   9,070.25 |
| 6/11/2022 | 2HGFB2F55CH600694 | $   8,323.87 |
| 6/11/2022 | 1FMCU0GX7DUB88000 | $  13,525.40 |
| 6/18/2022 | 1FADP3F29EL101637 | $  13,354.06 |
| 6/18/2022 | 1FM5K7D84DGC81057 | $   8,504.24 |
| 6/29/2022 | KMHCT4AE5FU915137 | $  12,908.26 |
| 7/19/2022 | 2C3CDXCT1DH599965 | $   8,450.47 |
| 8/6/2022 | 2C4RDGEG1GR352482 | $  12,682.80 |
| 8/8/2022 | 1N4AL3AP7DN551310 | $  18,056.66 |
| 8/9/2022 | 1C3CCCAB4FN596428 | $  11,434.74 |
| 8/12/2022 | KM8J33A2XGU089846 | $  11,896.08 |
| 8/27/2022 | 1C6RR6GT8ES179228 | $  18,338.65 |
| 9/6/2022 | WBY1Z8C30HV894691 | $  17,017.53 |
| 9/24/2022 | KL4CJASB4KB720661 | $  12,955.81 |
| 10/4/2022 | 3CZRU5H34JM712821 | $  21,313.73 |
| | **Total:** | **$  413,350.42** |

# EXHIBIT C

**LAW 553-HI-ARB-eps 1/21**

## CREDIT SALE CONTRACT-MOTOR VEHICLE - SIMPLE FINANCE CHARGE
## (WITH ARBITRATION PROVISION)

| Buyer Name or Business Name and Buyer Address and Mailing Address (if different) (Including County and Zip Code) | Co-Buyer Name or Business Name and Co-Buyer Address and Mailing Address (if different) (Including County and Zip Code) | Seller-Creditor (Name and Address) Bayview Auto Sales 94-263 Farrington Hwy Waipahu, HI 96797 |
|---|---|---|

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements in this contract. You agree to pay the Seller - Creditor and the holder of this contract (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge in U.S. funds according to your Payment Schedule below. We will figure the Finance Charge on a daily basis. The Federal Truth-In-Lending Disclosures below are part of this contract. You authorize us to obtain information about you, or the vehicle you are buying, from the state motor vehicle department or other motor vehicle registration authorities.

| New/Used | Year | Make and Model | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|
| | | | | Personal, family, or household unless otherwise indicated below <br> ☐ business <br> ☐ agricultural     ☐ _____ |

### FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down payment of $_____ is |
|---|---|---|---|---|
| _____ % $ | $ (e) | $ | $ (e) | $ (e) |

(e) means an estimate

**Your Payment Schedule Will Be:**

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| | $ | Monthly                    beginning |
| | $ | |

Late Charge. If payment is not received in full within __10__ days after it is due, you will pay a late charge of $ __50.00__ or __5__ % of the part of the payment that is late, whichever is __less__.

Prepayment. If you pay early, you will not have to pay a penalty.

Security Interest. You are giving a security interest in the vehicle being purchased.

Additional Information: See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date and security interest.

**SERVICING AND COLLECTION CONTACTS** You agree that we may contact you in writing, by e-mail, or using prerecorded/artificial voice messages, text messages, and automatic telephone dialing systems, as the law allows. You also agree that we may contact you in these and other ways at any address or telephone number you provide us, even if the telephone number is a cell phone number or the contact results in a charge to you.

**APPLICABLE LAW** This contract has been delivered to us and accepted by us in the State of Hawaii. By signing this contract, you (including all buyers, guarantors, and other owners) agree to submit to the jurisdiction of the state and federal courts in the State of Hawaii, and further agree that any legal action that may be filed by you elsewhere will be transferred to an appropriate court in Hawaii if we decide that we want it to be transferred. The law of the State of Hawaii will govern this contract, except that this sentence shall not limit or waive the application of any federal law or regulation. If any term of this contract conflicts with the law, all other terms of this contract will still remain in effect if they can be given effect without the conflicting term. This means that any terms of this contract which conflict with the law can be separated from the remaining terms, and the remaining terms will still be enforced.

**Agreement to Arbitrate:** By signing below, you agree that, pursuant to the Arbitration Provision on page 5 of this contract, you or we may elect to resolve any dispute by neutral, binding arbitration and not by a court action. See the Arbitration Provision for additional information concerning the agreement to arbitrate.

Buyer Signs X _____     Co-Buyer Signs X _____

☒ (check if applicable - used vehicles only)          **"AS IS"**

**THIS VEHICLE SOLD "AS IS". YOU WILL HAVE TO PAY FOR ANY REPAIRS NEEDED AFTER SALE. IF WE HAVE MADE ANY PROMISES TO YOU, THE LAW SAYS WE MUST KEEP OUR PROMISES, EVEN IF WE SELL "AS IS". TO PROTECT YOURSELF, ASK US TO PUT ALL PROMISES IN WRITING.**

X _____          X _____
Buyer Signs                          Date          Co-Buyer Signs                          Date

Buyer Signs X _____     Co-Buyer Signs X _____          *LAW 553-HI-ARB-eps 1/21 v1*  Page 1 of 6

**ITEMIZATION OF AMOUNT FINANCED**

1  A  Cash Price including Accessories .......................... $ _____
   B  Safety Inspection Fee Paid to Seller .................... $ _____
   C  Other _____ $ _____
   D  Other _____ $ _____
   E  Other _____ $ _____
   F  Other _____ $ _____
   G  General Excise Tax ..................................... $ _____
   H  Other Tax _____ $ _____
      Total Cash Price (A through H) ...................... $ _____ (1)

2  Total Downpayment
      Trade-In _____
          (Year)         (Make)              (Model)
      Gross Trade-In Allowance .............................. $ _____
      Less Pay Off Made By Seller to _____ $ _____
      Equals Net Trade-In (Indicate if negative amount) $ _____
      + Cash ................................................. $ _____
      + Dealer Rebate ....................................... $ _____
      + Manufacturer Rebate ................................ $ _____
      + Other _____ $ _____
      + Other _____ $ _____
      + Other _____ $ _____
      Total Downpayment (If total downpayment is negative, enter "0" and see 4H below) $ _____ (2)
3  Unpaid Balance of Cash Price (1 minus 2) ............... $ _____ (3)
4  Other Charges Including Amounts Paid to Others on Your Behalf
      (Seller may keep part of these amounts):
   A  Cost of Optional Credit Insurance Paid to Insurance Company or Companies.
      Life                              $ _____
      Disability                        $ _____     $ _____
   B  Vendor's Single Interest Insurance Paid to Insurance Company  $ _____
   C  Optional Gap Contract .................................. $ _____
   D  Official Fees Paid to Government Agencies ......... $ _____
   E  Government Taxes Not Included in Cash Price ...... $ _____
   F  Government License and/or Registration Fees
      _____
      _____ $ _____ (e)
   G  Government Certificate of Title Fees .................. $ _____
   H  Other Charges (Seller must identify who is paid and describe purpose)
      to _____  for Prior Credit or Lease Balance  $ _____
      to Seller _____  for Documentary Fee (not a governmental fee)  $ _____
      to _____  for _____ $ _____
      to _____  for _____ $ _____
      to _____  for _____ $ _____
      to _____  for _____ $ _____
      to _____  for _____ $ _____
      to _____  for _____ $ _____
      to _____  for _____ $ _____
      to _____  for _____ $ _____
      to _____  for _____ $ _____
      to _____  for _____ $ _____
      to _____  for _____ $ _____
      Total Other Charges and Amounts Paid to Others on Your Behalf  $ _____ (4)
5  Amount Financed (3 + 4) ............................... $ _____ (5)
   (e) means an estimate

☐ VENDOR'S SINGLE INTEREST INSURANCE (VSI Insurance): If the preceding box is checked, the Creditor requires VSI insurance for the initial term of the contract to protect the Creditor for loss or damage to the vehicle (collision, fire, theft, concealment, skip). VSI Insurance is for the Creditor's sole protection. This insurance does not protect your interest in the vehicle. You may choose the insurance company through which the VSI insurance is obtained. If you elect to purchase VSI Insurance through the Creditor, the cost of this insurance is $ N/A and is also shown in Item 4B of the Itemization of Amount Financed. The coverage is for the initial term of the contract.

---

Insurance. You may buy the physical damage insurance this contract requires from anyone you choose who is acceptable to us. You may also provide the physical damage insurance through an existing policy owned or controlled by you that is acceptable to us. You are not required to buy any other insurance to obtain credit unless the box indicating Vendor's Single Interest Insurance is required is checked below. Your decision to buy or not buy other insurance will not be a factor in the credit approval process.

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

**Check the insurance you want and sign below:**

**Optional Credit Insurance**
☐ Credit Life:  ☐ Buyer  ☐ Co-Buyer  ☐ Both
☐ Credit Disability:  ☐ Buyer  ☐ Co-Buyer  ☐ Both

|  | Premium | Term |
|---|---|---|
| Credit Life $ N/A | | |
| Credit Disability $ N/A | | |

Insurance Company Name _____

Home Office Address _____

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not buy credit life insurance and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. If you choose this insurance, the cost is shown in item 4A of the Itemization of Amount Financed. Credit life insurance is based on your original Payment Schedule. This insurance may not pay all you owe on this contract if you make late payments. Credit disability insurance does not cover any increase in your payment or in the number of payments. Coverage for credit life insurance and credit disability insurance ends on the original due date for the last payment unless a different term for the insurance is shown below.

I want the insurance checked above.

X _____
Buyer Signature                          Date
X _____
Co-Buyer Signature                       Date

**THIS DOES NOT INCLUDE INSURANCE ON YOUR LIABILITY FOR BODILY INJURY OR PROPERTY DAMAGE. IT DOES NOT MEET THE REQUIREMENTS FOR PROOF OF FINANCIAL RESPONSIBILITY UNDER HAWAII LAW.**

You agree to pay a charge of up to $30, or as the law permits, if any check you give us is dishonored or any electronic payment you make is returned unpaid.

**SERVICE CONTRACT** (Optional). By initialing below, you request a service contract written with the following company for the term shown below. The cost is shown in item 4H of the Itemization of Amount Financed.

Company _____
Term 0 _____ Mos. or 0 _____ Miles
Company N/A _____
Term N/A _____ Mos. or N/A _____ Miles
Company N/A _____
Term N/A _____ Mos. or N/A _____ Miles
Company N/A _____
Term N/A _____ Mos. or N/A _____ Miles
Company N/A _____
Term N/A _____ Mos. or N/A _____ Miles
X _____
Signature of Buyer

The Documentary Fee shown in item 4H of the Itemization of Amount Financed is not a governmental fee but is a dealer charge for services related to the sale including the processing of sale documents.

---

Buyer Signs X _____     Co-Buyer Signs X _____     *LAW 553-HI-ARB-eps 1/21 v1*     Page 2 of 6

OTHER IMPORTANT AGREEMENTS

**1. FINANCE CHARGE AND PAYMENTS**

a. **HOW WE WILL FIGURE FINANCE CHARGE.** We will figure the Finance Charge on a daily basis at the Annual Percentage Rate on the unpaid part of the Amount Financed.

b. **HOW LATE PAYMENTS OR EARLY PAYMENTS CHANGE WHAT YOU MUST PAY.** We based the Finance Charge, Total of Payments, and Total Sale Price shown on page 1 of this contract on the assumption that you will make every payment on the day it is due. Your Finance Charge, Total of Payments, and Total Sale Price will be more if you pay late and less if you pay early. Changes may take the form of a larger or smaller final payment or, at our option, more or fewer payments of the same amount as your scheduled payment with a smaller final payment. We will send you a notice telling you about these changes before the final scheduled payment is due.

c. **PAYMENTS.** You promise to pay us, or to someone else if we so order, the Amount Financed and Finance Charge stated on page 1 of this contract by making the payments stated in Your Payment Schedule. You also will pay everything else you owe under the terms of this contract with your last scheduled payment. Your payments will be applied first to the earned and unpaid part of the Finance Charge; second to the unpaid part of the Amount Financed; and last to any other amounts you owe under this contract. In addition, if we incur expenses or perform services due to a special request by you, we may add such expense or a fee for such services to the amount you owe under this contract.

d. **PERMITTED FINANCE CHARGE.** We do not wish to charge you more Finance Charge than is permitted by law, and we believe we are not doing so. However, if changes in Your Payment Schedule are necessary to comply with any law, we may give you a refund or make appropriate adjustments or changes to payments already made or to future payments in order to reduce the amount of Finance Charge on the period we may collect it to the legally permitted limits.

e. **YOU MAY PREPAY.** You may prepay all or part of the unpaid part of the Amount Financed at any time without penalty. If you do so, you must pay the earned and unpaid part of the Finance Charge and all other amounts due up to the date of your payment.

f. **YOUR RIGHT TO REFINANCE A BALLOON PAYMENT.** A balloon payment is a scheduled payment that is more than twice as large as the average of your earlier scheduled payments. If you are purchasing the vehicle primarily for personal, family, or household use, you have the right to refinance the amount of a balloon payment when it is due without penalty. If the Amount Financed is less than $10,000 or if this is a door-to-door sale, you may refinance the balloon payment in equal installments over a term no shorter than that of the original contract, with no installment greater than the average of the scheduled payments of your original contract, and the other terms of the refinancing will be no less favorable to you than those of your original contract. This provision does not apply if your Payment Schedule was adjusted to your seasonal or irregular income.

**2. PRESERVATION OF THE VEHICLE.** Until all amounts owing under this contract are paid in full:

- You must keep the vehicle in good condition and repair, and protect it against loss, damage or deterioration. You must not damage or destroy the vehicle or use it in any way that tends to do so.
- You must license, register, use and control the vehicle as the law requires. You must pay all license and registration fees before they are overdue.
- You must give us the number of each license and registration and all legal ownership certificates, which will show us as the legal owner.
- You must show us the vehicle and let us look it over within a reasonable time of our notice to you. You must not alter or rebuild the vehicle. You must not operate or use the vehicle if not permitted to do so under the property insurance policies required in this contract or under any law.
- You must let us know right away of any change of address or storage place of the vehicle.
- You must let us know right away if the vehicle is damaged or destroyed.
- You must not use the vehicle for any unlawful purposes (such as illegally transporting or concealing liquor, drugs, narcotics or any other kind of contraband), or for racing competition of any type, or for military purposes.
- You must not abandon, sell or transfer the vehicle or any right to it to anyone without our prior written consent.
- You must be the owner of the vehicle and keep complete and total control of it. No one other than us may have any claim of any kind to the vehicle. No financing statement showing any secured party other than us and covering the vehicle is on file in any public office.
- You must keep the vehicle free from, and if necessary defend it in court against, all claims of everyone else but us and people to whom we consent.
- You must pay before they are overdue, all taxes, bills for repairs or storage and other liens, security interests and charges of any kind, whoever supposedly owes them, on the vehicle or any interest in it or for its use or operation. If we pay any repair bills, storage bills, taxes, fines, or charges on the vehicle, you agree to repay the amount when we ask for it.
- You must not do anything or let anything happen which will make or let the vehicle become subject to any claim or liable to seizure in bankruptcy or otherwise, or which will impair our interest in it.

**3. YOUR OTHER PROMISES TO US**

a. **IF THE VEHICLE IS DAMAGED, DESTROYED, OR MISSING.** You agree to pay us all you owe under this contract even if the vehicle is damaged, destroyed, or missing.

b. **USING THE VEHICLE.** You agree not to remove the vehicle from the island in Hawaii where you first keep it, or to sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission. You agree not to expose the vehicle to misuse, seizure, confiscation, or involuntary transfer.

c. **ADVANCES.** If you do not pay any taxes, insurance premiums, or other charges relating to the vehicle, we may pay these charges for you. We may also take any steps which we consider appropriate to protect the vehicle and may charge the cost of doing so to you. You will repay us all advances. Any amount we pay may be added to the amount you owe under this contract, and we may increase at our option the amount or the number of your payments or the size of your final payment to provide for payment of the additional amounts.

d. **SECURITY INTEREST (including SETOFF).** You give us a security interest in:
- The vehicle and all parts of goods installed in or attached to it;
- All money or goods received (proceeds) for the vehicle;
- All insurance, maintenance, service, or other contracts we finance for you; and
- All proceeds from insurance, maintenance, service, or other contracts we finance for you. This includes any refunds of premiums or charges from the contracts.

This secures payment of all you owe on this contract. It also secures your other agreements in this contract. You agree that we may apply any premium or charges from the contracts refunded on any insurance, maintenance, service, gap, or other contracts which you buy in connection with this contract toward the contract balance. We are retaining title to the vehicle and a Hawaii Uniform Commercial Code security interest in the vehicle until you pay all you owe under this contract. You will make sure the title shows our security interest (lien) in the vehicle. You will not allow any other security interest to be placed on the title without our written permission.

We may set off amounts due under this contract against any amounts we may owe you, such as your checking and savings account, to the extent permitted by law and without any advance notice. This is called our right of "setoff."

e. **TITLE; FINANCING STATEMENT.** You will name us as the legal owner on the title to the vehicle. The registered owner will be the Buyer, the Other Owner or both, as you designate. You agree to cooperate in any way to establish, preserve, and protect our security interest. You will pay all license and regulation fees when due and furnish us all legal ownership certificates for the vehicle if you receive them.

f. **INSURANCE YOU MUST HAVE ON THE VEHICLE.**
Property insurance is required. You may obtain such insurance from any insurance company you choose that is authorized to do business in the State of Hawaii and through any person you choose. You will insure the vehicle against the hazards and in the form and amount we specify in this contract. You will insure the vehicle for its actual cash value against fire, theft, and the risk listed in the comprehensive coverage and against collision or upset in the same amount less a maximum deductible of $500.00. Each policy insuring the vehicle will be payable to both you and us. You agree to name us on your insurance policy as an additional insured and as loss payee. You will furnish us satisfactory evidence of insurance. Each policy you get will provide that the insurance company will give us at least ten (10) days' written notice before the policy is canceled.

If you fail to obtain or provide proof of the insurance described above, or if you fail to pay any insurance premium, we may, at our option, obtain insurance coverage at your expense for our interest only. Insurance purchased by us will not cover your equity or your interest in the vehicle. Any coverage we purchase will not include insurance on liability for bodily injury or property damage, and will not meet the requirement for proof of financial responsibility under Hawaii law. Insurance purchased by us at your expense may protect our interest in the vehicle. Any amounts we pay will be added to the amount you owe. The charge will be the premium for the insurance and a Finance Charge computed at the Annual Percentage Rate shown on page 1 of this contract or, at our option, the highest rate the law permits. If the vehicle is lost or damaged, at our option, we can use the insurance proceeds to replace or repair it or to repay any amounts you owe under this contract. The charges for insurance we obtain may be substantially higher than the charges you would have incurred if you purchased the insurance you are required by this contract to have on the vehicle yourself. You are free to obtain your own insurance at any time through any insurance company of your choice, unless we, for good cause, refuse to accept it. We will cancel any insurance we may have placed upon receipt of evidence of your having acceptable insurance in effect.

g. **REMOVAL OF YOUR VEHICLE FROM HAWAII. (Non-Military).** This paragraph will apply only if you are not a member of the armed forces of the United States on active duty at the time of signing this contract. The vehicle may be removed from the State of Hawaii only after you receive a separate written consent from us. We will consent to the removal of the vehicle from the State of Hawaii if, at the time of removal, all of the following conditions are met:
- The vehicle is being shipped to a location within the continental United States.
- You provide us with your new mailing address (and residence address if different from your mailing address) and written, verifiable confirmation of employment at your next place of residence.
- You are not in default of any promise or obligation under this contract.
- We are satisfied that your relocation will not adversely affect your financial condition and ability to fulfill your promises and obligations under this contract.
- Your record of payments due under this contract is determined by us, in our sole discretion, to be satisfactory.
- You furnish evidence satisfactory to us that you have continuously maintained the property insurance required under the contract. This condition shall not be satisfied if we purchased the property insurance because you failed to maintain it.
- All who signed this contract, such as co-buyers, guarantors, which may also include the original Seller (Dealer), or other owners, have agreed in writing to the removal of the vehicle from the State.
- No derogatory credit report on you has been filed with any credit reporting agency since the purchase of the vehicle.
- The balance due under this contract does not exceed the wholesale value of the vehicle as shown in the current Kelley Blue Book, or if not available, another nationally recognized used car pricing guide. If you are denied permission to remove the vehicle from the State, we will provide you with a written statement of the reasons for the denial. If you are a member of the armed forces of the United States on active duty at the time of signing this contract, the removal of the vehicle from the State of Hawaii may be governed by an agreement which is separate from this contract.

Buyer Signs X _____     Co-Buyer Signs X _____

4.  **IF YOU PAY LATE OR BREAK YOUR OTHER PROMISES**

    a.  **YOU MAY OWE LATE CHARGES.** You will pay a late charge on each late payment as shown on page 1 of this contract. Acceptance of a late payment or late charge does not excuse your late payment or mean that you may keep making late payments. If you pay late, we may also take the steps described below.

    b.  **YOU MAY HAVE TO PAY ALL YOU OWE AT ONCE.** If you break your promises (default), we may demand that you pay all you owe on this contract at once. You will be in default if (a) you fail to make any payment, when due under this contract or any other obligation you owe us, (b) you fail to keep any of your other promises in this contract, (c) you die, terminate, or dissolve your business, corporation, or other entity, or are involved in any bankruptcy or insolvency proceeding brought by or against you, (d) any representation that you have made to us in this contract or to induce us to make this contract is false, or (e) you give false, incomplete, or misleading information during credit application. The amount you will owe will be the unpaid part of the Amount Financed plus the earned and unpaid part of the Finance Charge, any late charges, and any amounts due because you defaulted.

    c.  **YOU MAY HAVE TO PAY COLLECTION COSTS.** If we hire an attorney or licensed collector who is not our salaried employee to collect what you owe, you will pay our reasonable attorneys' fees or collector's fees. If we file a lawsuit to collect on this contract you will pay court costs as permitted by law whether or not we hire an attorney.

    d.  **OUR RIGHTS IF YOU DEFAULT.** If you are in default under this contract, we may do one or more of these things.
    *   Require you to deliver possession of the vehicle to us at a place where we choose which is reasonably convenient to both of us.
    *   Enter wherever the vehicle is located and take (repossess) the vehicle from you if we do so peaceably and the law allows it. We will not be responsible for anything left in the vehicle or attached to it when we repossess it. Any accessories, equipment, or replacement parts will remain with the vehicle.
    *   Claim benefits under and cancel any insurance, maintenance, service, gap, or other contracts purchased under this contract to repair the vehicle or obtain refunds of unearned charges to reduce what you owe. If we cancel them, we will have no liability for anything that happens that would otherwise have been covered by the canceled insurance or maintenance, service, gap, or other contracts. If the vehicle is a total loss because it is confiscated, damaged, or stolen, you agree that we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe.
    *   Sell the vehicle to a wholesaler or retailer or any other person by any reasonable method.
    *   Use the proceeds of the sale toward what you owe us. We can add to what you owe us the cost of the collection, repossession, retaking, holding, preparing for sale, sale, court costs, and reasonable attorney's fees. If you owe more than the sale proceeds, you will pay us the difference. If you owe less than the sale proceeds, we will pay you the difference unless the law requires us to pay it to someone else.
    *   Require you to pay our court costs and attorney's fees as described in this contract.
    *   Exercise all rights which the Hawaii Uniform Commercial Code, the Hawaii Credit Sales Act, and all other laws and regulations give to us.
    *   Before or after selling the vehicle, we may obtain a court judgment against you for all you owe under this contract, and we may collect the judgment by any legal means.

    e.  **HOW YOU CAN GET THE VEHICLE BACK IF WE TAKE IT.** If we repossess the vehicle, you may pay to get it back (redeem). We will tell you how much to pay to redeem. Your right to redeem ends when we sell the vehicle.

    f.  **WAIVERS.** You waive your rights to require us to do certain things. Those things are: (a) to demand payment of amounts due (known as "presentment"); (b) to give notice that amounts due have not been paid (known as "notice of dishonor"); and (c) to obtain an official certification of nonpayment (known as a "protest"). Anyone else who agrees to keep the promises made in this contract, or who agrees to make payment to us if you fail to keep your promises under this contract, also waives these rights. These persons are known as "guarantors."

    g.  **SCOPE OF YOUR RESPONSIBILITY.** If more than one Buyer signs this contract, each of you is fully and personally obligated to pay the full amount owed and to keep all of the promises made in this contract. Any guarantor of this contract is also obligated to do these things. We may enforce our rights under this contract against each of you individually or against all of you together. This means that any one of you may be required to pay all the amounts owed under this contract. Any person who takes over your rights or obligations under this contract will have all of your rights and must keep all of your promises made in this contract. Any person who takes over the rights or obligations of a guarantor of this contract is also obligated to keep all of the promises made in this contract. You cannot assign this contract without our written consent.

    h.  **SCOPE OF OUR RIGHTS.** We may exercise the following rights without giving notice to anyone, getting the consent of anyone, or releasing anyone from the obligation to pay the full amount of this contract. Those rights are: (a) to release other security (including a co-guarantor); (b) to grant any releases or compromises; (c) to sue any guarantor directly without first suing you or any other person or selling any security or pursuing any other remedy; or (d) to collect from any guarantor notwithstanding real or personal defenses (such as usury or failure of consideration) you may have. We also have all other rights which the law gives to us. Any person who takes over our rights under this contract will have all of our rights.

    i.  **RECOVERY OF REVERSED PAYMENTS.** If any payment previously applied to your obligation under this contract must be returned by us as a voidable preference under the Bankruptcy Code or for any other reason, whether by court order, administrative order, settlement, or otherwise, you and any guarantor of this contract will remain liable for the full amount returned. You and any such guarantor will remain liable as if such amount had never been received by us, notwithstanding any cancellation of this contract or termination of the guaranty or other agreement evidencing the obligation of any guarantor.

    j.  **CONTINUATION OF OUR RIGHTS.** Even if we do not exercise or enforce any right which we have under this contract or under the law, we will still have all of those rights and may exercise and enforce them in the future.

    k.  **EXERCISE OF MORE THAN ONE RIGHT.** Each of our rights under this contract is separate. We may exercise and enforce one or more of those rights, as well as any of our other rights under the law, one at a time or all at once.

5.  **WARRANTIES SELLER DISCLAIMS**

    Unless the Seller makes a written warranty, or enters into a service contract within 90 days from the date of this contract, the Seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose.
    This provision does not affect any warranties covering the vehicle that the vehicle manufacturer may provide.

6.  **USED CAR BUYERS GUIDE.** The information you see on the window form for the vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.
    Spanish Translation: Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.

---

**Seller's Right to Cancel**

    a.  Seller agrees to deliver the vehicle to you on the date this contract is signed by Seller and you. You understand that it may take a few days for Seller to verify your credit, locate financing for you on the exact terms shown on page 1 of this contract, and assign this contract to a financial institution. You agree that Seller has the number of days stated on page 6 of this contract to assign this contract. You agree that if Seller is unable to assign this contract within this time period to any one of the financial institutions with whom Seller regularly does business under an assignment acceptable to Seller, Seller may cancel this contract. Seller's right to cancel this contract ends upon assignment of this contract.

    b.  If Seller elects to cancel per Paragraph a above, Seller will give you written notice (or in any other manner in which actual notice is given to you). In that event, you may have the option of negotiating and signing a new contract with different financing terms (for example, a larger down payment, a higher annual percentage rate, a required cosigner, etc.) or you may pay with alternate funds arranged by you.

    c.  Upon receipt of the notice of cancellation, you must return the vehicle to Seller within 48 hours in the same condition as when sold other than reasonable wear for the time you had it. Except as described below, Seller must give you back all consideration Seller has received from you in connection with this contract.

    d.  If you do not return the vehicle within 48 hours after receipt of the notice of cancellation, you agree that Seller may use any lawful means to take it back (including repossession if done peacefully) and you will be liable for all expenses incurred by Seller in taking the vehicle from you, including reasonable attorney's fees. If you fail to return the vehicle within 48 hours after receipt of the notice of cancellation, you agree to pay Seller the charge shown in the Seller's Right to Cancel provision on page 6 of this contract for each day you do not return the vehicle after receipt of the notice of cancellation.

    e.  While the vehicle is in your possession, all terms of this contract, including those relating to use of the vehicle and insurance for the vehicle, are in full force and you assume all risk of loss or damage to the vehicle. You must pay all reasonable costs for repair of any damage done to the vehicle while the vehicle is in your possession. Seller may deduct from any consideration due to you under paragraph c. above Seller's reasonable costs to repair the vehicle and any daily charges you incur if you fail to return the vehicle within 48 hours after receipt of the notice of cancellation. If Seller cancels this contract, the terms of this Seller's Right to Cancel provision (including those on page 6 of this contract) remain in effect even after you no longer have possession of the vehicle.

---

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

Buyer Signs X _____    Co-Buyer Signs X _____        *LAW 553-HI-ARB-eps 1/21 v1*    Page 4 of 6

## ARBITRATION PROVISION
### PLEASE REVIEW - IMPORTANT - AFFECTS YOUR LEGAL RIGHTS

1. **EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL.**
2. **IF A DISPUTE IS ARBITRATED, YOU WILL GIVE UP YOUR RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU MAY HAVE AGAINST US INCLUDING ANY RIGHT TO CLASS ARBITRATION OR ANY CONSOLIDATION OF INDIVIDUAL ARBITRATIONS.**
3. **DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.**

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this Arbitration Provision, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase or condition of this vehicle, this contract or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. If federal law provides that a claim or dispute is not subject to binding arbitration, this Arbitration Provision shall not apply to such claim or dispute. Any claim or dispute is to be arbitrated by a single arbitrator on an individual basis and not as a class action. You expressly waive any right you may have to arbitrate a class action. You may choose the American Arbitration Association (www.adr.org) or any other organization to conduct the arbitration subject to our approval. You may get a copy of the rules of an arbitration organization by contacting the organization or visiting its website.

Arbitrators shall be attorneys or retired judges and shall be selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law and the applicable statute of limitations. The arbitration hearing shall be conducted in the federal district in which you reside unless the Seller-Creditor is a party to the claim or dispute, in which case the hearing will be held in the federal district where this contract was executed. We will pay your filing, administration, service or case management fee and your arbitrator or hearing fee all up to a maximum of $5000, unless the law or the rules of the chosen arbitration organization require us to pay more. The amount we pay may be reimbursed in whole or in part by decision of the arbitrator if the arbitrator finds that any of your claims is frivolous under applicable law. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. If the chosen arbitration organization's rules conflict with this Arbitration Provision, then the provisions of this Arbitration Provision shall control. Any arbitration under this Arbitration Provision shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and not by any state law concerning arbitration. Any award by the arbitrator shall be in writing and will be final and binding on all parties, subject to any limited right to appeal under the Federal Arbitration Act.

You and we retain the right to seek remedies in small claims court for disputes or claims within that court's jurisdiction, unless such action is transferred, removed or appealed to a different court. Neither you nor we waive the right to arbitrate by using self-help remedies, such as repossession, or by filing an action to recover the vehicle, to recover a deficiency balance, or for individual injunctive relief. Any court having jurisdiction may enter judgment on the arbitrator's award. This Arbitration Provision shall survive any termination, payoff or transfer of this contract. If any part of this Arbitration Provision, other than waivers of class action rights, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable. If a waiver of class action rights is deemed or found to be unenforceable for any reason in a case in which class action allegations have been made, the remainder of this Arbitration Provision shall be unenforceable.

**OPTIONAL GAP CONTRACT.** A gap contract (debt cancellation contract) is not required to obtain credit and will not be provided unless you sign below and agree to pay the extra charge. If you choose to buy a gap contract, the charge is shown in Item 4C of the Itemization of Amount Financed. See your gap contract for details on the terms and conditions it provides. It is a part of this contract.

Term _____ Mos. _____

_____

                                       Name of Gap Contract

I want to buy a gap contract.

Buyer Signs X _____

---

**SELLER'S RIGHT TO CANCEL** - If Buyer and Co-buyer sign here, the provisions of the Seller's Right to Cancel section on page 4 of this contract, which gives the Seller the right to cancel if Seller is unable to assign this contract within _____30_____ days, will apply. If you fail to return the vehicle within 48 hours after receipt of the notice of cancellation, you agree to pay Seller a charge of $ 50 _____ per day from the date of cancellation until the vehicle is returned or repossessed.

X ▮▮▮▮▮▮▮▮▮▮▮▮▮            X _____
B▮                          Co-Buyer Signs

---

## This ☐ IS ☒ IS NOT a door-to-door sale. There ☐ IS A ☒ IS NO 3-DAY RIGHT TO CANCEL on this purchase.

                      Customer's Initials           Salesperson's or Dealer's Initials

**HOW THIS CONTRACT CAN BE CHANGED.** This contract contains the entire agreement between you and us relating to this contract. Any change to this contract must be in writing and we must sign it. No oral changes are binding.   Buyer Signs X _____   Co-Buyer Signs X _____
If any part of this contract is not valid, all other parts stay valid. We may delay or refrain from enforcing any of our rights under this contract without losing them.

*The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.*

**ACKNOWLEDGEMENT:** You agree to the terms of this contract. You confirm that before you signed this contract, we gave it to you, and you were free to take it and review it. You confirm that you received a completely filled-in copy when you signed it. You acknowledge that this contract contains an agreement to arbitrate disputes.

## NOTICE TO THE BUYER: Do not sign this contract before you read it. When you sign this contract, you are entitled to a copy of it that is filled in, in every necessary respect. You should keep it. This contract is covered by Hawaii's credit sale law, and you have the rights of a buyer under that law. You also may have rights under other state and federal laws.

### CREDIT SALE CONTRACT

Buyer Signs X ▮▮▮▮▮▮▮▮▮▮▮    Date ▮▮▮▮▮▮    Co-Buyer Signs X _____   Date _____
Buyer Printed Name ▮▮▮▮▮▮▮▮▮▮▮▮▮      Co-Buyer Printed Name _____
If the "business" use box is checked in "Primary Use for Which Purchased": Print Name _____  Title _____

**DOOR-TO-DOOR SALE NOTICE. If the above sale is a door-to-door sale: YOU, THE BUYER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT.**

**Co-Buyers and Other Owners** — A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The other owner agrees to the security interest in the vehicle given to us in this contract.

Other owner signs here X _____      Address _____
Seller signs Bayview Auto Sales By Edward Shaughnessy  Date ▮▮▮▮▮▮  By X _____    Title _____

---

Seller assigns its interest in this contract to Ally Capital      (Assignee) under the terms of Seller's agreement(s) with Assignee.
☐ Assigned with recourse           ☒ Assigned without recourse           ☐ Assigned with limited recourse
Seller Bayview Auto Sales
By X _____                                      Title Owner

# EXHIBIT D

**Dealer Name:** BAYVIEW AUTO SALES

Dealer Phone #: 808-486-3636
Dealer Fax #: 808-676-2003

**PLEASE PRINT - INCOMPLETE APPLICATIONS WILL NOT BE PROCESSED.**

**INSTRUCTIONS:**
You may apply for credit in your name alone, whether or not you are married.
(1) Please indicate whether you are applying for ☑ Individual Credit ☐ Joint Credit ☐ Community Property State ☐ Business Application
(2) ☑ If you are applying for individual credit in your name and relying on your own income or assets and not the income or assets of another person as the basis of repayment of the credit requested, complete only Section A.
(3) ☐ If you are applying for joint credit with another person, complete sections A and B. We intend to apply for joint credit.

Applicant                           Co-Applicant

* If you are married and live in a community property state, please complete Section B about yourself and Section B about your spouse. You must sign this application. Your spouse must sign this application only if s/he wishes to be a Co-Applicant.

### A. APPLICANT INFORMATION

| Last Name | First Name | Middle Initial | Social Security Number | Birth Date |
|---|---|---|---|---|
| | | | | |

| Address | Apt # / Suite # | P.O. Box | Rural Route | City | State | Zip |
|---|---|---|---|---|---|---|
| | | | | | | |

| Home Phone | Cell Phone | Residential Status | Time at Address | Rent/Mtg. Pmt. $ |
|---|---|---|---|---|
| | | | Yrs. Mos. | |

| E-Mail Address | Driver's License No. | Driver's License State | Time at Previous Address |
|---|---|---|---|
| | | | Yrs. Mos. |

| Previous Full Address (if less than 2 years) | Apt # / Suite # | P.O. Box | Rural Route | City | State | Zip |
|---|---|---|---|---|---|---|
| | | | | | | |

| Employer Name | Employment Type |
|---|---|
| | |

| Salary | Salary Type | Occupation | Length of Employment | Work Phone Number * |
|---|---|---|---|---|
| | | | Yrs. Mos. | |

| Previous Employer Name | Previous Employment Type |
|---|---|
| | ☐ Employed ☐ Unemployed ☐ Self-employed ☐ Military ☐ Retired ☐ Student ☐ Other |

| Previous Occupation | Length of Employment | Previous Work Phone Number |
|---|---|---|
| | Yrs. Mos. | |

Alimony, child support, or separate maintenance income need not be revealed if you do not choose to have it considered as a basis for repaying this obligation.

| Other Income (Monthly) | Source of Other Income | By Signing, you certify that the income entered on this Credit Application is accurate. |
|---|---|---|
| | | X |

Comments

### AGREEMENT

The words "we," "us," "our" and "ours" as used below refer to us, the dealer, and to the financial institution(s) selected to receive your application. You understand and agree that you are applying for credit by providing the information to complete and submit this credit application. We may keep this application and any other application submitted to us and information about you whether or not the application is approved. We certify that the information on the application and in any other application submitted to us, is true and complete. You understand that false statements may subject you to criminal penalties. The words "you," "your" and "yours" mean each person submitting this application. You authorize us to submit this application and any other application submitted in connection with the proposed transaction to the financial institutions disclosed to you by us the dealers; in addition, in accordance with the Fair Credit Reporting Act, you authorize that such financial institutions may submit your applications to other financial institutions for the purpose of fulfilling your request for credit. This application will be reviewed by the dealer and such financial institutions.

You agree that we may obtain a consumer credit report periodically from one or more consumer reporting agencies (credit bureaus) in connection with the proposed transaction and any update, renewal, refinancing, modification or extension of that transaction. You also agree that we or any affiliate of ours may obtain one or more consumer credit reports on you at any time during the term of your financing.. If you ask, you will be told whether a credit report was requested, and if so, the name and address of any credit bureau from which we or our affiliate obtained your credit report. You agree that the dealer and the financial institutions may verify your employment, pay, assets and debts, and that anyone receiving a copy of this is authorized to provide such dealer and financial institutions with such information. You further authorize the dealer and the financial institutions to gather whatever credit and employment history each considers necessary and appropriate in evaluating this application and any other applications submitted in connection with the proposed transaction. You understand that we will rely on the information in this credit application in making our decision. The dealer and the financial institutions may monitor and record telephone calls regarding your account for quality assurance, compliance, training, or similar purposes.

You consent to receive autodialed, prerecorded and artificial voice calls and text messages for servicing and collection purposes from us at the telephone number(s) provided in this credit application, including any cell phone numbers. This consent applies to the dealer, who is the originating creditor in this transaction, as well as any assignee who may purchase your credit contract. You agree that this consent applies regardless of whether you agree to receive telemarketing sales calls and text messages as provided below.

**You consent to receive autodialed, pre-recorded and artificial voice telemarketing and sales calls and text messages from or on behalf of dealer (or any financing source to which dealer assigns my contract) at the following number(s) (808)699-5813 including any cell phone numbers. You understand that this consent is not a condition of purchase or credit.**

You opt in                           You do not opt in

Signature of Applicant for election above:

Your dealer will inform you of the name and address of the financing sources to which this application shall be sent.

**BY SIGNING BELOW, YOU CERTIFY THAT YOU HAVE READ AND AGREE TO THE TERMS AND DISCLOSURES ON ALL PAGES OF THIS APPLICATION.**

X
APPLICANT'S SIGNATURE                 DATE

Non-Authoritative Copy [20220827]

# EXHIBIT E

# GUARANTY AND ACKNOWLEDGMENT AGREEMENT FOR RETAIL CHARGEBACKS

This Guaranty and Acknowledgment Agreement (the "Guaranty") dated _8/9/16_ is entered into by Ally Bank (a/k/a Ally Capital in Hawaii, a/k/a Ally Bank Corp. in New Mexico, a/k/a Ally Capital Corp. in Arizona, Mississippi, Montana, New Jersey, and Wisconsin ("Bank")), Ally Financial Inc. ("Ally" and together with Bank, the "Ally Parties"), BAYVIEW AUTO SALES, LLC ("Dealer") and Edward J. Shaughnessy (individually, "Guarantor") (Dealer and Guarantor, collectively "Guarantor").

## WITNESSETH

WHEREAS, Dealer entered into an (check the agreement that applies below)

☐ Ally Master Retail Agreement (MRA) with Ally and Bank
dated _____, (together with any subsequent agreement replacing or amending any of its terms and any successor to any such subsequent agreement, the "Agreement");

☒ Ally Master Retail-Lease Agreement (MRLA) with Ally and Bank
dated _____8-9-16_____, (together with any subsequent agreement replacing or amending any of its terms and any successor to any such subsequent agreement, the "Agreement");

☐ Ally Master Retail Agreement for Recreational Vehicles (MRARV) with Ally and Bank
dated _____, (together with any subsequent agreement replacing or amending any of its terms and any successor to any such subsequent agreement, the "Agreement");

WHEREAS, the Agreement requires, among other things, that the Dealer reimburse the Ally Parties for the Dealer's proportionate share of any prepayment rebate paid by the Ally Parties on certain retail contracts assigned by Dealer to the Ally Parties, on the terms set forth in the Agreement;

WHEREAS, Guarantor is financially interested in the affairs of Dealer;

WHEREAS, Dealer and Guarantor in certain circumstances may request the Ally Parties to release certain security interests in assets of the Dealer so that such assets may be conveyed free and clear to a new dealer; and

WHEREAS, each of the Ally Parties requires that Dealer and Guarantor jointly and severally covenant and agree to promptly and faithfully perform all obligations of Dealer under the Agreement, including, without limitation, all obligations arising under Section 2 of Exhibit 1 of the Agreement (Ally Retail Plan);

NOW, THEREFORE, for good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  The Dealer acknowledges that it is obligated to perform all obligations pursuant to the Agreement.

GARTGG_GUARACKRTCBK (4/14)

2. The Guarantor hereby unconditionally guarantees to each of the Ally Parties and their respective successors and assigns, payment when due, whether by acceleration or otherwise, of all existing and future indebtedness to each of the Ally Parties (including, without limitation, all costs of collecting such indebtedness, including reasonable attorney fees) and any and all obligations arising pursuant to the Agreement which have been or may be incurred or evidenced, whether or not such indebtedness is known to the undersigned at the time of this Guaranty or at the time any future indebtedness is incurred.

3. The undersigned Guarantor waives notice of acceptance of this Guaranty, and presentment, demand, protest, notice of protest, notice of default and diligence in collecting any such indebtedness, and agrees that each of the Ally Parties, without notice to the Guarantor or Dealer, may modify the terms of borrowing, compromise, extend, renew or forebear to enforce payment of any part or all of any such indebtedness, without affecting in any manner the unconditional obligation of the undersigned under this Guaranty.

4. The Dealer and Guarantor agree that no security now or hereafter held by either of the Ally Parties for the payment of any such indebtedness, whether from the Dealer, the Guarantor or otherwise, and whether in the nature of a security interest, pledge, lien, assignment, set-off, suretyship, guaranty, indemnity, insurance or otherwise, shall affect in any manner the unconditional obligation of the undersigned under this Guaranty, and that each of the Ally Parties, in its sole discretion, without notice to the undersigned, may release, exchange, enforce and otherwise deal with any such security without affecting in any manner the unconditional obligation of the undersigned under this Guaranty.

5. If this Guaranty is executed by two or more Guarantors, the obligation shall be several and also joint, each with all and also each with any one or more of the others, and may be enforced at the option of each of the Ally Parties against each Guarantor severally, any two or more Guarantors jointly, or some severally and some jointly. Each of the Ally Parties, in its sole discretion, may release any one or more of the undersigned Guarantors for any consideration which it deems adequate, and may fail or elect not to prove a claim against the estate of any bankrupt, insolvent, incompetent or deceased Guarantor; and thereafter, without notice to any other Guarantor, each of the Ally Parties may extend or renew any part or all of any indebtedness or obligation of the Dealer to such Ally Party, and may permit the Dealer to incur additional indebtedness, without affecting in any manner the unconditional obligation of the remaining Guarantors; such action by either or both of the Ally Parties shall not, however, be deemed to affect any right of contribution among the Guarantors.

6. This Guaranty is not intended to and does not relieve Dealer or Guarantor of any of their other obligations owed to either or both of the Ally Parties under any other agreement or guaranty but merely provides that Dealer and Guarantor shall be jointly and severally liable for the Dealer's obligations under the Agreement to the extent set forth above.

7. This Guaranty shall be construed in accordance with the laws of the State of New York.

Dated: 8/9/16

Edward J. Shaughnessy

(Individual)

BAYVIEW AUTO SALES, LLC
(Dealership)

By: _____ CEO
     Authorized Signatory – Title

ALLY FINANCIAL

By: _____    Asst. Sec.
     Authorized Signatory – Title

ALLY BANK

By: _____    Asst. Sec.
     Authorized Signatory – Title

GARTGG_GUARACKRTCBK (4/14)